497 A.2d 649

**COMMONWEALTH of Pennsylvania**

**v.**

**Susan M. O'HAYER, Appellant.**

Superior Court of Pennsylvania.

Argued June 19, 1985.

Filed Aug. 23, 1985.

Petition for Allowance of Appeal Denied Feb. 20, 1986.

74

William R. Bernhart, Reading, for appellant.

Charles M. Guthrie, Jr., Assistant District Attorney, Reading, for Commonwealth, appellee.

Before MONTEMURO, POPOVICH and WATKINS, JJ.

POPOVICH, Judge:

This is an appeal from a judgment of sentence (48 hours to 12 days in jail, plus costs) by the appellant, Susan M. O'Hayer, for driving a vehicle while intoxicated (75 Pa.C.S.A. § 3731(a)(1)) and driving on the wrong side of the roadway (75 Pa.C.S.A. § 3301(a)). We affirm.

The facts are not complicated. The appellant drove her vehicle across a divided highway and struck an on-coming vehicle head-on. As a result thereof, she was taken to a nearby hospital for treatment in the early morning hours of February 4, 1983. Once there, the appellant consented to have her blood tested for alcohol since the accompanying police officer detected a strong odor of liquor on her breath.

The test was administered by Carol Ann Good, the hospital's Medical Laboratory Technologist, under the eye of a supervisor. The results of the test indicated that the appellant had a .25 blood alcohol at the time of the accident. Thereafter, the appellant was arrested and charged with the Motor Vehicle Code violations cited previously.

The issues presented for our review, albeit not dealt with by an appellate court in this Commonwealth, are, as is evident from the appellant's suppression and post-trial motions as well as the suppression court's opinion to us, 1)

whether the hospital was licensed by the Department of Health to operate a clinical laboratory; 2) whether the person who conducted the blood test met the requirements of the Department of Health; and 3) whether the testing equipment was approved by the Department of Health.[1]

■ It is clearly evident from the suppression hearing transcript that the Director of Pathology at Reading Hospital and Medical Center (Dr. I. Donald Stuard) produced a license approved by the Pennsylvania Department of Health for the period when the appellant's blood was removed and tested. (N.T. 50) In fact, at 13 Pennsylvania Bulletin 814 (1983), the hospital is listed as an approved laboratory by the Department of Health for the performance of serium and blood analysis. See *Commonwealth v. Gotto*, 306 Pa.Super. 434, 442 n. 8, 452 A.2d 803, 807 n. 8 (1982).

Therefore, we conclude that the appellant's contention of lack of licensure on the part of the hospital is meritless. 28 Pa.Code § 5.11.

We next decide whether Carol Ann Good was qualified to conduct a test of the appellant's blood.

We begin by noting that the Department of Health's initial rules, proposed to govern clinical laboratories, defined "Technologist" to mean "a properly qualified individual according to § 5.24(a) of the [proposed] regulations." 3 Pennsylvania Bulletin 1219 (1973). The applicable section read:

### § 5.24. Qualifications of technical personnel.

(a) A technologist performs laboratory tests which require independent judgment and responsibility with mini-

---

1. It needs to be mentioned here that to the extent the Department of Transportation is the governmental agency which has the authority under subsection (a) of section 1547, 75 Pa.C.S.A. to approve the equipment used and the personnel to perform the chemical test of breath or blood, we need not delve into the distinction, as is applicable to the Department of Health having the authority to regulate the two aforementioned criteria, since the appellant's argument would appear to be directed solely at subsection (c) of section 1547. This provision relates to the authority to be wielded by the Department of Health under the Motor Vehicle Code, as is applicable here. See *Commonwealth v. Benson*, 280 Pa.Super. 20, 421 A.2d 383 (1980).

mal supervision. He must have a bachelor's degree in the biological or physical sciences; or in a medical technology, and one year of experience in a clinical laboratory acceptable to the Department.

3 Pennsylvania Bulletin 1221 (1973). Thereafter, on March 2, 1974, the Department of Health altered its proposed rules; e.g., "Technologist" was defined as "a properly qualified individual according to § 5.24 of the [proposed] regulations." 4 Pennsylvania Bulletin 374 (1974). The relevant section provided:

### § 5.24. Qualifications of technical personnel.

(a) A clinical laboratory technologist shall perform clinical laboratory tests with minimal supervision by the director and/or supervisors, while working in those areas in which he is qualified by education *and/or* experience. * * *.

4 Pennsylvania Bulletin 376 (1974) (Emphasis added).

The final draft, which was altered an additional time before codification, appears at 28 Pa.Code § 5.24; to-wit:

### § 5.24. Qualifications of technical personnel.

(a) A clinical laboratory technologist shall perform clinical laboratory tests with minimal supervision by the director or supervisors, while working in those areas in which he is qualified by education or experience. A clinical laboratory technologist shall have the following qualifications:

(1) A baccalaureate degree in medical technology or in a chemical, physical, or biological science and clinical education in a program accredited by an agency recognized by the Department which includes one year of experience acceptable to the Department.

(2) An individual without the baccalaureate degree may become qualified as a technologist according to the provisions of section 241.

Title XI of the Social Security Amendments of 1972 Public Law 92-603, 42 U.S.C. § 1320a-2.

(b) Technical personnel below the level of technologist shall be determined by the director to be fully qualified for all assigned technical duties.

(c) Notwithstanding any other provision of this Chapter, any individual who has been employed in a clinical laboratory as a technologist prior to the effective date of these provisions may continue to act in such capacity and shall not be required to meet the requirements of subsections (a) and (b) of this section.

We learn from Mrs. Good's testimony that her qualifications consisted of the following: 1) She attended Drexel University for three years; 2) She served a year in a clinical internship program at Nazareth Hospital School of Medicine; and 3) She practiced medical technology for the last 17 years, 5 years of which were in her present position at Reading Hospital. Her work was primarily in chemistry.

Also, Mrs. Good remarked that during her tenure at Reading Hospital she performed "several hundred" blood alcohol tests, and, consequently, "ha[d] used many times" the machine in question.

Turning to the statute, we observe that an individual in a clinical laboratory is considered competent to work in such an area if (s)he "is qualified by education or experience." 28 Pa.Code § 5.24(a).

 Instantly, aside from her educational credentials, we cannot discount the fact that Mrs. Good had 17 years of practical "hands-on" *experience* in the clinical field, with a concentration in the area of medical technology. We do not interpret Section 5.24, or 42 U.S.C. § 1320a–2 cited therein,[2] to require more than was provided by the witness regarding

**2.** The federal statute reads:

**§ 1320a–2. Qualifications for health care personnel**

(a) The Secretary, in carrying out his functions relating to the qualifications for health care personnel under subchapter XVIII of this chapter, shall develop (in consultation with appropriate professional health organizations and State health and licensure agencies) and conduct (in conjunction with State health and licensure agencies) until September 30, 1983, a program designed to determine the proficiency of individuals (who do not otherwise meet the formal educational, professional membership, or other specific criteria

her ability to perform properly the test at issue. This determination is reinforced by the Department of Health's deletion, in the final draft, of the requirements that a "Technologist" must have had a bachelor's degree plus one year's experience (1973 proposal), as well as the excising of the criteria that such a person be qualified by "education *and* experience" (1974 proposal).

To acquiesce to the demands of the appellant, we believe, would render the language in the present statute relating to

established for determining the qualifications of practical nurses, therapists, laboratory technicians, and technologists, and cytotechnologists, X-ray technicians, psychiatric technicians, or other health care technicians and technologists) to perform the duties and functions of practical nurses, therapists, laboratory technicians, technologists, and cytotechnologists, X-ray technicians, psychiatric technicians, or other health care technicians and technologists. Such program shall include (but not be limited to) the employment of procedures for the formal testing of the proficiency of individuals. In the conduct of such program, no individual who otherwise meets the proficiency requirements for any health care specialty shall be denied a satisfactory proficiency rating solely because of his failure to meet formal educational or professional membership requirements.

(b) If any individual has been determined, under the program established pursuant to subsection (a) of this section, to be qualified to perform the duties and functions of any health care specialty, no person or provider utilizing the services of such individual to perform such duties and functions shall be denied payment, under subchapter XVIII of this chapter or under any State plan approved under subchapter XIX of this chapter, for any health care services provided by such person on the grounds that such individual is not qualified to perform such duties and functions.

Aug. 14, 1935, c. 531, Title XI, § 1123, as added Oct. 30, 1972, Pub.L. 92–603, Title II, § 241, 86 Stat. 1418, and amended Dec. 5, 1980, Pub.L. 96–499, Title IX, § 911, 94 Stat. 2619; Sept. 3, 1982, Pub.L. 97–248, Title I, § 126, 96 Stat. 366.

As for the promulgation of testing measures to gauge the proficiency of health care personnel, i.e., technologists, by this Commonwealth, in concert with the federal agency stated above, our meticulous review of the Pennsylvania Bulletin from 1972 through Volume 15, Number 27 (July 6, 1985), has uncovered the adoption of no such testing measures.

Based on the testimony of Mrs. Good, the Director of Pathology at Reading Hospital and the documentary evidence before this Court, we find no reason to hold that the testing of appellant's blood was improperly performed merely because of Mrs. Good's "failure to meet formal educational or professional membership requirements." 42 U.S.C. § 1320a–2(a).

the reliance upon "experience", as a criterion to satisfy the qualification requirement, to mere surplusage. We will not render a portion of the law ineffectual for such an action is contrary to statutory interpretation. 1 Pa.C.S.A. § 1921(a).

▆ Finally, we address the contention of the appellant that the equipment utilized by Reading Hospital to analyze her blood alcohol was not approved by the Department of Health. We do not agree.

The Director of Pathology at Reading Hospital testified that his facility used the Dupont A.C.A.[3] in testing for blood alcohol.

In checking the accuracy of the automated machine, the director recounted the following:

THE WITNESS: Well, Dupont makes reagent packs—individual reagent packs by lot numbers and we check those reagents with every lot number that we get according to standard. Everytime we do a legal blood alcohol, we do a standard one with one of the reagent packs and then we follow that through the instrument with the specimen and the next reagent pack, again, all from the same lot.

And the test, itself, is essentially an automated test where a compound in the reagent pack is altered by the chemical reaction, and that compound as it is altered changes the intensity of light that passes through the reagent pack, and for those of you who are familiar with the spectrophotometer, this is an automated spectrophotometer or light-measuring instrument, at the wavelenght [sic] which is most sensitive for the compound that is changing. And there is a standard run-of-the-mill practice for measuring chemical compounds of all sorts.

THE COURT: As I understand, this machine does not work like the Intoxilyzer for breath alcohol, that it transmits a reading, the operator of the machine must compare certain reactions from the reagents, and I assume there is a chart that you must follow to determine blood alcohol?

3. Acronym for Automatic Clinical Analyzer.

THE WITNESS: The instrument is so automated, Your Honor, that it makes those comparisons for you.

THE COURT: It does make the comparisons autimatically [sic]?

THE WITNESS: It is a sophisticated, electric instrument, like small computers, but it is—every instrument in the laboratory needs to be checked to make sure that it is functioning properly. That's why you put a standard or alcohol through it at designated times, and that varies from instrument to instrument. In our case, we standardize by lot and before every legal blood alcohol. (N.T. 55-57)

The director also recalled that when the hospital sends its "proficiency testing results" back to the Department of Health:

... we indicate the *type of equipment* on which the test was performed. It just so happens the type of equipment we use is quite standard and if they [—The Department of Health] wanted to object to it, I would think—

(N.T. 54-55) (Emphasis added)

At this point, to facilitate our discussion, we need to examine the relevant statutes on this matter; namely 28 Pa.Code § 5.103, which reads:

**§ 5.103. Blood tests for blood alcohol content.**

Equipment used for blood analysis to determine the amount of alcohol in a person's blood which performs such analysis by means of gas chromatography, enzymatic procedures, distillation procedures, or diffusion procedures is approved by the Department provided that:

(1) The equipment is located within a clinical laboratory currently licensed by the Department.

(2) The particular brand or model of equipment used and any reagent or procedures relating thereto have not been prohibited by specific notification of the Department pursuant to § 5.46 (relating to reagents and equipment).

(3) Any clinical laboratory performing blood analyses with such equipment has in effect an approval to provide

such special analytical services pursuant to § 5.50 (relating to approval to provide special analytical services).[4]

And, we need to look at 28 Pa.Code § 5.46, which provides:

### § 5.46. Reagents and equipment.

Reagents, procedures, or equipment which have been demonstrated to be inadequate for clinical laboratory use as evidenced by reliable data from generally acceptable scientific testing and evaluating sources shall be prohibited for use by clinical laboratories upon specific notification by the Department. Also reagents, equipment, and procedures which do not have substantial proof of efficacy either by trial or extended use experience shall be prohibited for routine use.

Based on the fact, in light of the aforecited statutory language, that the Department of Health would have been notified of the *type of machine* Reading Hospital was using each time it sent in its "proficiency testing results" (as to the reagent packets) to reflect the continued accuracy of its machine, the Department of Health's failure to notify the hospital of the prohibition of such a machine, as required by Section 5.46, for such testing purpose renders the Reading Hospital's continued use acceptable and proper.

Evidence also indicates, from our review of the case law, that equipment similar to the type utilized by the hospital, i.e., the Dupont A.C.A., received approval from the Department of Health as early as January of 1978 in the Pennsylvania Bulletin. See *Commonwealth v. Cook*, 277 Pa.Super. 152, 419 A.2d 707 (1980).

Moreover, the Department of Health's "notice" listing those "laboratories qualified to perform alcohol analyses of blood" included Reading Hospital and Medical Center.[5]

---

4. See note 5, *infra.*, for documentation that Reading Hospital also met the requirements of 28 Pa.Code § 5.50.

5. The "notice" provides:

**NOTICES**
**DEPARTMENT OF**
**HEALTH**
**Approved Laboratories**

Notice is hereby given that the following laboratories are licensed by the Department of Health under the Clinical Laboratory Act (35

Accordingly, finding none of the issues raised to be meritorious, we affirm the judgment of sentence.

P.S. § 2151 *et seq.*) and are currently approved by the Department under 28 Pa.Code § 5.50, to perform alcohol analyses of blood and/or serum. This approval is based on demonstrated proficiency in periodic tests conducted by the Department's Bureau of Laboratories. Accordingly, under section 3755 of the Vehicle Code, as amended by section 11 of Act 289 of 1982, 75 Pa.C.S. § 101 *et seq.*, these laboratories are designated as qualified to perform the types of specialized services which will reflect the presence of alcohol in the blood. Persons seeking these services should determine that the laboratory they use employs techniques and procedures that are acceptable for forensic purposes. The list of approved laboratories will be revised semiannually.

The symbols "S" and "B" indicate the following:

S = approved for serum analyses

B = approved for blood analyses

SB—approved for serum and blood analyses

* * * * * *

Reading Hospital & Med. Ctr. SB

Reading, Pa. 19602

215–378–6080

13 Pennsylvania Bulletin 812, 814 (1983).