**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Rene C. SMITH, Appellant.**

Superior Court of Pennsylvania.

Argued June 19, 2002.
Filed Sept. 23, 2002.

---

James P. Miller, Smethport, for appellant.

John H. Pavlock, Asst. Dist. Atty., Smethport, for Commonwealth, appellee.

Before: JOHNSON, JOYCE and HESTER, JJ.

OPINION BY JOYCE, J.:

¶ 1 Rene C. Smith, Appellant, appeals from the judgement of sentence imposed on July 1, 1999 in the Court of Common Pleas of McKean County. We affirm. The relevant facts and procedural history are as follows.

¶ 2 On September 19, 1996, Appellant was operating her vehicle on Route 219 in Lafayette Township when she crossed the centerline and collided with a vehicle driven by Danny Eschrich. Various county personnel, including the Deputy Coroner, Michael Cahill (hereinafter "Cahill"), responded to the scene. It was immediately determined that Mr. Eschrich (hereinafter "victim") was dead. Appellant was transported to the hospital, and her blood was drawn for treatment purposes. The responding State Trooper, Officer Allen, obtained a copy of the blood test results, which included the result of a blood alcohol content (BAC) test revealing a level of .19%. Appellant was charged with Homicide by Vehicle While Driving Under the Influence, Homicide by Vehicle, Driving Under the Influence of Alcohol (two counts), Driving on Roadways Laned for Traffic, and Careless Driving.[1]

¶ 3 On February 9, 1998, Appellant filed an omnibus pretrial motion seeking the suppression of the BAC test result. The motion was granted and the evidence suppressed based on the fact that Officer Al-len had obtained an invalid search warrant for Appellant's medical records prior to seizing them. However, the Commonwealth yet again obtained the BAC test results, alleging that it obtained the same evidence from an independent source subsequent to the initial suppression. Consequently, on May 26, 1998, Appellant filed a second omnibus pretrial motion, again seeking the suppression of Appellant's BAC test results. This motion was denied.

¶ 4 Various other pretrial motions were filed and denied. Appellant then proceeded to a jury trial and was found guilty of all of the charges. She was sentenced on July 1, 1999 to an aggregate term of incarceration of three to seven years. Both Appellant and the Commonwealth filed post-trial motions. Following the resolution of the motions on September 9, 1999, this timely appeal was filed. The trial court ordered Appellant to file a statement of matters complained of on appeal, with which Appellant complied.[2]

¶ 5 Appellant presents the following eight issues for our consideration:

1. Should the McKean County Court of Common Pleas have suppressed the result of a blood alcohol test, obtained by then McKean County Detective Kyle Lindsay, pursuant to a search warrant?

 a. Was the search warrant properly issued under the Pennsylvania and United States Constitutions and the requirements of the Pennsylvania Rules of Criminal Procedure?

 b. Did Detective Lindsay obtain the evidence of the result of [Appellant's]

---

1. 75 Pa.C.S.A. §§ 3735, 3732, 3731(a)(1) and (a)(4), 3309, and 3714, respectively.

2. Various motions were filed relating to the 1925(b) statement, apparently concerning the transcripts, one of which was never filed. Appellant has utilized, under objection, Pa. R.A.P.1923, which allows a party to file a statement in lieu of transcripts when the official transcript is unavailable. The missing transcript and subsequent statement in lieu of transcript pertains to the initial suppression hearing held on March 27, 1998.

blood alcohol test independent from the prior investigation wherein the same evidence was suppressed?

2. Should the McKean County Court of Common Pleas have suppressed all evidence, and fruits thereof, seized by Deputy Coroner Cahill?

3. Should the McKean County Court of Common Pleas have excluded the testimony of Sherry DuPont, and the testimony of Deputy Coroner Cahill that he found two drinking chips from the Riddell House in [Appellant's] purse?

4. Should the McKean County Court of Common Pleas have excluded the results of [Appellant's] blood alcohol test because of the qualifications of the technologist who performed the test?

5. May a lay coroner offer an opinion as to the cause of death?

6. Was the opinion of Deputy Coroner Cahill sufficient to meet the Commonwealth's burden of proof, concerning the causation of death?

7. Should the McKean County Court of Common Pleas have excluded the relation back testimony of Dr. Blanding?

8. Should the McKean County Court of Common Pleas have excluded the Commonwealth's demonstrative evidence— testimony about an experiment and a video, used in rebuttal?

Appellant's Brief, at 5.

 ¶ 6 Appellant's first argument alleges that the trial court erred in not suppressing the result of Appellant's BAC test, which was obtained by Detective Lindsay via a search warrant.

When we review the ruling of a suppression court, we must first ascertain whether its factual findings are supported by the record and whether the inferences and legal conclusions drawn from those facts are reasonable. Where the defendant challenges an adverse ruling of the suppression court, we will consider only the evidence for the prosecution and whatever evidence for the defense that remains uncontradicted in context of the whole record. If there is support on the record, we are bound by the facts as found by the suppression court, and we may reverse that court only if the legal conclusions drawn from these facts are in error.

If there is sufficient evidence of record to support the suppression court's ruling and that court has not misapplied the law, we will not substitute our credibility determination for that of the suppression court judge.

*Commonwealth v. Palmer*, 751 A.2d 223, 225–226 (Pa.Super.2000) (citations omitted).

¶ 7 Presently, the uncontradicted facts begin with State Police Officer Allen's initial receipt of Appellant's medical records. Since Trooper Allen did not have a valid search warrant, Appellant successfully moved for the suppression of the records. Subsequently, Detective Lindsay of the McKean County District Attorney's Office began conducting his own investigation. N.T., Suppression Hearing, 7/9/98 at 4. His pursuits led him to call the 911 center in McKean County, from whom he learned the identity of Donald Fowler, the Fire Chief of Lafayette Township. *Id.* at 6. When contacted by Detective Lindsay, Mr. Fowler indicated that he recalled the accident and noticed the smell of alcohol emanating from Appellant's person when he observed her inside and outside of her vehicle. *Id.* at 9. Mr. Fowler also advised Detective Lindsay that the Bradford City Fire and Ambulance Association responded to the collision and transported Appellant to the hospital. *Id.* at 9–10. Thereafter, detective Lindsay contacted the Bradford City Fire and Ambulance Association and learned that James Coder was

on the ambulance crew the evening of the collision.[3] Detective Lindsay spoke with Mr. Coder, who stated that he recalled the accident and also smelled an odor of alcohol on Appellant both when she was inside and outside of her vehicle. *Id.* at 10. Mr. Fowler indicated that he had never spoken to a law enforcement official about his observations. *Id.* at 12. Detective Lindsay admitted that he had "skimmed" the District Attorney's file regarding Appellant, and that Officer Allen's report was contained therein. *Id.* at 4–5. The report was used to aid Detective Lindsay in his investigation to the extent that he obtained the date and location of the accident, the names of those involved, and other general information. *Id.* at 5–6. He also testified that he could have gotten much of the same information from other public sources such as a published newspaper article regarding the accident. *Id.* at 17.

¶ 8 Based on Mr. Fowler's and Mr. Coder's statements that they had smelled alcohol on Appellant's person, Detective Lindsay filled out an affidavit of probable cause for a search warrant of Appellant's medical records, which was issued by a district justice. He presented the search warrant to Bradford Regional Medical Center and received the records, which again included the results of Appellant's BAC test. Appellant once more moved for the suppression of the test results; however, the suppression court concluded that the warrant was valid and that the Commonwealth had obtained the information for the warrant through independent sources apart from the original taint.

¶ 9 The independent source doctrine, also sometimes referred to as the inevitable discovery doctrine, was discussed by our Supreme Court in *Commonwealth v. Melendez*, 544 Pa. 323, 676 A.2d 226 (1996). In *Melendez*, police were conducting an undercover surveillance of a house. An application for a search warrant was being drafted when the police observed the defendant leave the house, get into an automobile, and drive away. Police stopped the defendant, removed her from the vehicle, searched her purse and discovered a gun, a large amount of cash and a drug tally sales sheet. After transporting the defendant to her house, police used her keys to gain access to the premises. Upon entering, police observed the defendant's co-defendant holding a bag of cocaine. The police secured the scene and waited an hour for the arrival of the search warrant. Upon executing the search warrant, police discovered drugs, cash and other evidence of narcotic trafficking.

¶ 10 On appeal, the defendant alleged that the initial stop and search was illegal, requiring the suppression of the evidence obtained as a result. She also contended that the subsequent warrantless entry of the home was illegal, also requiring suppression of the evidence seized from therein. Regarding the search of the home, the trial court determined that the evidence discovered would have been admissible under the several legal theories including the inevitable discovery rule. In considering this, the Supreme Court held:

> [A]pplication of the "independent source doctrine" is proper only in the very limited circumstances where the "independent source" is *truly independent from both the tainted evidence and the police or investigative team which engaged in the misconduct by which the evidence was discovered.*

Suppression Hearing, 7/09/98, at 18.

---

3. Neither Mr. Coder nor Mr. Fowler were mentioned in Officer Allen's report. N.T.,

*Melendez, supra,* 676 A.2d at 231 (emphasis in original). Applying this standard, the Supreme Court held that the conduct of the police in conducting an illegal search and seizure and then detaining the defendant and the codefendant in the secured premises, all the while waiting to see *if* their application for a warrant was even approved, did not qualify under the independent source doctrine. *Id.*

¶ 11 Before discussing the application of the independent source doctrine, we must first determine whether the search warrant was invalid, as alleged by Appellant. In resolving this issue, the suppression court engaged in an analysis as to the validity of the search warrant pursuant to Pa.R.Crim.P.2003 and 2006.[4] Rule 2003 provides:

> (a) no search warrant shall issue but upon probable cause supported by one or more affidavits sworn to before the issuing authority. The issuing authority, in determining whether probable cause has been established, may not consider any evidence outside the affidavits.
>
> (b) at any hearing on a motion of the return or suppression of evidence, or for suppression of the fruits of evidence, obtained pursuant to a search warrant, no evidence shall be admissible to establish probable cause other than the affidavits provided for in paragraph (a).

Pa.R.Crim.P.2003. *See also, Commonwealth v. Edmunds,* 526 Pa. 374, 586 A.2d 887, 901 (1991) (only evidence contained within the four corners of the affidavit may be considered to establish probable cause). Rule 2006 sets forth the requisite contents of an application for a search warrant as follows:

> [e]ach application for a search warrant shall be supported by written affidavit(s)

signed and sworn to or affirmed before an issuing authority, which affidavit(s) shall:

> (a) state the name and department, agency, or address of the affiant;
>
> (b) identify specifically the items or property to be searched for and seized;
>
> (c) name or describe with particularity the person or place to be searched; identify the owner, occupant, or possessor of the place to be searched;
>
> (e) specify or describe the crime which has been or is being committed;
>
> (f) set forth the facts and circumstances which form the basis for the affiant's conclusion that there is probable cause to believe that the items or property identified are evidence or fruit of a crime, or are contraband, or are otherwise unlawfully possessed or subject to seizure, and that these items or property are located on the particular person or at the particular place described; . . . .

Pa.R.Crim.P.2006.

¶ 12 In finding that the requirements under Rules 2003 and 2006 were adhered to, the suppression court stated:

> . . . Lindsay provided his name, badge number, affiliation with the McKean County District Attorney's Office, and the date of the application for the search warrant. Lindsay specifically requested "[a]ny medical records related to blood alcohol testing or test results pertaining to Rene C. Smith. . . ." See Affidavit of Probable Cause, p. 2. [footnote omitted]. Lindsay named the Medical Records Department of the Bradford Regional Medial Center as the location to be searched; identified the Director of Medical Records of the Bradford Regional Medical

---

4. The Rules of Criminal Procedure have since been renumbered. Rule 2003 is now Rule 203 and Rule 2006 is now Rule 206.

Center, Ashifa Bhayani, as the owner or possessor of the premises; identified the following crimes, homicide by vehicle while driving under the influence, homicide by vehicle, driving under the influence, driving on roadways laned for traffic, and careless driving. Lindsay also set forth several paragraphs in which he described 1) his experience and authority to conduct investigations and execute search warrants, 2) a description of the accident, 3) a statement that one driver was pronounced dead at the scene while the other driver was transported to Bradford Regional Medical Center, 4) Fowler's statement that he detected an odor of alcohol in the [Appellant's] vehicle and on [Appellant's] person; and 5) Coder's statement that he detected an odor of alcohol on the [Appellant's] vehicle and on [Appellant's] person.

Suppression Court's memorandum and order, 8/18/98, at 7. Our review of the affidavit and search warrant leads us to agree with the suppression court's determination that the warrant was valid.

■ ¶ 13 Appellant argues that because Detective Lindsay relied on Officer Allen's report to obtain information and also on the criminal complaint to know what charges to put on the search warrant application, his investigation was not truly independent. We disagree. The facts of this case are completely distinguishable from those in *Melendez* (and also those in *Commonwealth v. Mason*, 535 Pa. 560, 637 A.2d 251 (1993), upon which *Melendez* heavily relies). We do not have a situation where the police, in anticipation that a warrant will issue, violate a citizen's constitutional rights and then invoke the independent source doctrine. The case *sub judice* deals with evidence seized as a re-

sult of an invalid search warrant. The evidence, being fruit of the poisonous tree, was suppressed. Then, a completely different investigator, a detective with the district attorney's office, engaged in a totally separate investigation, months after the preceding illegal actions engaged in by the Pennsylvania State Police Officer. Detective Lindsay's primary evidence came from two independent witness who were not even mentioned in Officer Allen's report, much less relied upon to support the officer's affidavit of probable cause.[5] The suppression court determined that the independent source doctrine applied. Its factual findings are supported by the record and the inferences and legal conclusions drawn from those facts are reasonable. Hence, Appellant's first argument fails.

■ ¶ 14 Appellant's second argument alleges that the court erred in failing to suppress the evidence obtained as a result of Cahill's search and seizure of Appellant's purse. The purse was taken by Cahill out of Appellant's vehicle following her extraction. The purse contained two drinking chips from a local bar named Riddell House. The discovery of the chips eventually led police to go to Riddell House and to question Sherry DuPont, a bartender. Ms. DuPont told the police, and later testified at trial, that she had served Appellant two or three beers at approximately 2:00 or 3:00 p.m. on the day of the accident.

¶ 15 Cahill testified that he had been advised by the ambulance crew that Appellant would likely not survive. Thus, as was his custom, he removed the purse from the vehicle and inventoried its con-

---

**5.** Officer Allen interviewed Appellant and based solely on the interview applied for the search warrant.

tents. He then gave the property to Appellant's aunt.[6]

¶ 16 The Commonwealth argues that the coroner's actions were a private search, not conducted under the color of the state. However, if this Court were to determine that the search was not private but investigatory, then the Commonwealth argues that the search falls within several exceptions to the search warrant requirement.[7] Appellant counters by citing *Commonwealth v. Anderson*, 253 Pa.Super. 334, 385 A.2d 365 (1978) which states that a coroner is "part of the Commonwealth's criminal investigation team." *See also, Flanagan v. Labe*, 446 Pa.Super. 107, 666 A.2d 333, 337 (1995) (citing *Anderson* for the same proposition). As such, Appellant contends, Cahill needed a warrant to seize and search the purse. Appellant maintains that not only did Cahill not have a warrant, but that an exception does not exist that would have allowed him to conduct the search and seizure.

■ ¶ 17 In Pennsylvania, police are authorized to impound a vehicle in "circumstances that involve the community care-taking functions of the police, such as public safety concerns and traffic control concerns, and thus, comport with constitutional standards for impoundment." *Commonwealth v. Hennigan*, 753 A.2d 245, 259 (Pa.Super.2000). 75 Pa.C.S.A § 3352(c)(2) provides "any police officer may remove or cause to be removed to the place of business of the operator of a wrecker or to a nearby garage or other place of safety any vehicle found upon a highway under any of the following circumstances: (2) The person or persons in

charge of the vehicle are physically unable to provide for the custody or removal of the vehicle." Clearly, Appellant's vehicle, which was disabled and straddling the centerline of a state route, was a danger to the community. Appellant was physically unable to move the vehicle, if, in fact, the vehicle was not so impaired that it was able to be driven at all. Thus, the police were authorized to impound the vehicle as part of their community care-taking functions. Upon impounding the vehicle, the police would have then conducted an inventory search, including the purse and its contents.

¶ 18 An inventory search has long been established as an exception to the search warrant requirement. *Hennigan, supra*, 753 A.2d at 254.

> The purpose of an inventory search is not to uncover criminal evidence. Rather, it is designed to safeguard seized items in order to benefit both the police and the defendant. Inventory searches serve one or more of the following purposes: (1) to protect the owner's property while it remains in police custody; (2) to protect the police against claims or disputes over lost or stolen property; (3) to protect the police from potential danger; and (4) to assist the police in determining whether the vehicle was stolen and then abandoned.

*Id.* at 254–255.

¶ 19 Presently, we agree with the suppression court's finding that Cahill's actions in searching the purse were conducted in a care-taking function as opposed to an investigatory one. As he had been

---

**6.** 16 Pa.C.S.A. 1235(a) provides: "[t]he coroner shall safely keep in his charge all personal effects and property which appear to have been on or about the person at his time of his death, ...." Since Appellant did, in fact, survive, this section is inapplicable.

**7.** The exceptions include exigent circumstances and an inventory search. We cannot discern how exigent circumstances exist in this case to allow a warrantless search. An inventory search will be discussed, *infra*.

advised that Appellant was unlikely to survive the accident, he believed that he was acting within his statutory duty to collect her personal property, which was then inventoried. There is absolutely no evidence that he inventoried the contents of her purse for investigatory purposes. To the contrary, it appears as though the discovery of the drinking chips was never disclosed to the police or District Attorney's office until nearly 2½ years subsequent to the accident.[8] The drinking chips were not turned over to the police as evidence. Moreover, it is evident that the vehicle would have been impounded, as discussed *supra*. If Cahill had not seized Appellant's purse, and inventoried the contents, the police certainly would have. Therefore, we conclude that the drinking chips found in Appellant's purse would have inevitably been discovered by the police when they impounded the vehicle and conducted a routine inventory search. Hence, the trial court did not err in denying Appellant's motion to suppress the drinking chips.

¶ 20 Appellant's third issue alleges that the fact that Coroner Cahill discovered the drinking chips and the testimony of Sherry DuPont should have been excluded since both were irrelevant. Specifically, Appellant contends that Sherry DuPont's testimony, which placed Appellant at the Riddell House eight hours prior to the accident where she was served two or three alcoholic beverages, was too remote in time to be relevant.

¶ 21 The admissibility of evidence is solely within the discretion of the trial court and we will reverse on appeal only upon abuse of that discretion. *Commonwealth v. Rice*, 568 Pa. 182, 795 A.2d 340, 355 (2002). " 'Relevant evidence'

means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Pa. R.E. 401. Relevant evidence may be excluded if its prejudicial value outweighs its probative value. Pa.R.E. 403. "In determining whether the evidence is so remote that the prejudicial effect outweighs the probative value, the court has no fixed standard on which to rely, but must instead consider the nature of the crime, the evidence being offered, and all attendant circumstances." *Commonwealth v. Clark*, 280 Pa.Super. 1, 421 A.2d 374, 376 (1980), *affirmed*, 461 A.2d 794 (Pa.1983).

¶ 22 In the case *sub judice*, Appellant testified on her own behalf and stated that she had no recollection of her whereabouts or actions prior to the collision or even of the collision itself. She defended the criminal allegations by attempting to prove that her vehicle malfunctioned and caused the accident, as opposed to her intoxication. The evidence was relevant to prove that Appellant had been drinking, proof of which was necessary to establish the drinking elements of the homicide by vehicle while driving under the influence and the driving under the influence charges. We also note that the other evidence of Appellant's intoxication, the reliability of the BAC test result, was hotly contested, thereby making the testimony of Sherry DuPont that much more important. The evidence was relevant. The jury was free to determine what weight, if any, to give it due to its remoteness.

¶ 23 Appellant argues in her fourth issue that the trial court erred in refusing to exclude the results of Appel-

8. *See* Motion in Limine, Docket Entry 74 (seeking the suppression of the drinking chips since the crimes occurred on September 19, 1996 and Cahill never disclosed finding the chips until May 7, 1999 in violation of discovery).

lant's BAC test because of the lack of qualifications of the technician who performed the test. 75 Pa.C.S.A. § 1547(c) requires that BAC tests be "conducted by qualified persons using approved equipment." The term qualified person is defined as "an individual who is authorized to perform those chemical tests under the Act of September 26, 1951 (P.L. 1539, No. 389), known as the Clinical Laboratory Act, 35 P.S. § 2151 *et seq.*" Under the Criminal Laboratory Act, the Department of Health is authorized to issue regulations. 35 P.S. § 2161.1.28 Pa.Code § 5.24 regulates the qualifications of technical personnel and provides:

(a) A clinical technologist shall perform clinical laboratory tests with minimal supervision by the director or supervisors, while working in those areas in which he is *qualified by education or experience.* A clinical laboratory technologist shall have the following qualifications:

(1) A baccalaureate degree in medical technology or in chemical, physical or biological science and clinical education in a program accredited by an agency recognized by the Department which includes 1 year of experience acceptable to the Department.

(2) An individual without the baccalaureate degree may become qualified as a technologist according to the provisions of section 241 of Title XI of the Social Security Amendments of 1972 Public Law 92–603 (42 U.S.C.A. § 1320a–s).

(b) Technical Personnel below the level of technologist shall be determined by the director to be fully qualified for all assigned technical duties.

(c) Notwithstanding any other provision of this chapter, an individual who has been employed in a clinical laboratory as a technologist prior to the effective date of this chapter may continue to act in that capacity and may not be required to meet the requirements of subsections (a) and (b).

28 Pa.Code § 5.24 (emphasis added).

¶ 24 In *Commonwealth v. O'Hayer*, 345 Pa.Super. 73, 497 A.2d 649 (1985), this Court addressed the same argument Appellant presents before us now. The technician in *O'Hayer* attended Drexel University for three years, served a year in a clinical internship program at Nazareth Hospital School of Medicine, had been in the medical technology field for seventeen years, had performed several hundred BAC tests and had used the machine in question many times. *O'Hayer, supra,* 497 A.2d at 652. In examining the above-cited statutory provisions, and specifically the regulations, we observed that a technician may be qualified by either *education or experience.* The technician in *O'Hayer* had some education and quite a bit of experience and we declined to find her unqualified stating that to do so would "render the language in the present statute relating to the reliance upon 'experience', as a criterion to satisfy the qualification requirement, to mere surplusage." *Id.* at 653.

¶ 25 In the present case, the evidence of record established that the technician had two years of education at Alfred State College where he earned an Associates Degree in medical technology. N.T., trial, 5/11/99, at 41, 52. He worked as a technician at his current position at the Charles Cole Hospital Medical Center for one year and, prior to that, had worked at Bradford Regional Medical Center for four or five years. *Id.* Although not as experienced as the technician in *O'Hayer*, we find that the technician in this case possessed the requisite experience, combined with his educational credentials, to qualify him. Therefore, Appellant's argument fails.

¶ 26 Appellant's fifth issue alleges that the trial court erred in qualifying Cahill as an expert so that he could offer an opinion as to the cause of the victim's death. "A witness may testify as an expert provided that he or she possesses a 'reasonable pretension to specialized knowledge on the subject matter in question.' It is well settled and established in this Commonwealth that expertise can be acquired though occupational experience as well as by scientific study." *Commonwealth v. Spotz*, 756 A.2d 1139, 1160 (Pa. 2000), *cert. denied*, 532 U.S. 932, 121 S.Ct. 1381, 149 L.Ed.2d 307 (citations omitted).

¶ 27 The ability of a lay coroner to testify as to the cause of death was discussed in *Commonwealth v. Buzard*, 365 Pa. 511, 76 A.2d 394 (1950). In that case, the defendant was on trial for the beating death of another man. On appeal, he alleged trial court error in not permitting him to introduce into evidence the return of view of the lay county coroner. The return of view stated that "there was not sufficient evidence of [an] unlawful act or undue means used and that an inquest was not necessary. Death resulted from brain injury and shock 30 minutes [ ] due to blows on head and face, cerebral hemorrhage following a fight." *Buzard, supra*, 76 A.2d at 397. The defendant desired to use this return to contradict the trial testimony of the acting coroner who testified to what he saw on the face and body of the decedent. The Supreme Court, in rejecting the defendant's assertions, noted that the return could not have contradicted the testimony of the coroner since he did not testify to the cause of death. It was further noted that since the coroner was not a physician, he was not competent to testify as to the cause of death. *Id.*

¶ 28 Since *Buzard*, there have been several cases that involved a lay coroner testifying as an expert. For example, in *Com-*

*monwealth v. Richardson*, 307 Pa.Super. 191, 452 A.2d 1379 (1982), a lay coroner was called to offer his opinion of the victim's cause of death. The defendant objected, arguing that the prosecutor had not laid the foundation to qualify the coroner to give an opinion as to the cause of death. Ultimately, the foundation was never established, the coroner did not offer his opinion, and this Court found the evidence insufficient to sustain the defendant's conviction for homicide by vehicle while driving under the influence.

¶ 29 Also, in *Commonwealth v. Baker*, 299 Pa.Super. 241, 445 A.2d 544 (1982), a defendant's conviction for homicide by vehicle while driving under the influence was reversed. At trial, the Commonwealth presented the testimony of a lay county coroner who testified that he conducted a preliminary check of the victim at the scene. This occurred in the darkness at the scene and other than this cursory examination, nothing further was done and no other testimony was provided to establish cause of death. The coroner testified that based on his observations, the victim died as a result of fractures to the skull and neck and crush injuries to the chest. The coroner did not testify as to how he reached his conclusion except for his preliminary examination on the scene. There was no inquest or autopsy, and the coroner did not support his assertion with any physical evidence or description, or the testimony of a trained physician. Consequently, we determined that the evidence was insufficient to establish the causation element of homicide by vehicle. Neither *Baker* nor *Richardson* specifically discusses whether or not a lay coroner is *qualified* to offer an expert opinion as to the cause of death. Rather, in *Richardson*, the Commonwealth simply failed to preliminarily qualify the coroner and in *Baker*, the coroner's testimony was insufficient to prove the causation element.

¶ 30 More recently, in *Miller v. Brass Rail Tavern*, 541 Pa. 474, 664 A.2d 525 (1995), our Supreme Court granted allocatur in order to address whether a lay coroner was allowed to give an expert opinion regarding time of death. The Supreme Court noted that the "standard for qualification of an expert witness is a liberal one. The test to be applied when qualifying an expert witness is whether the witness has **any** reasonable pretension to specialized knowledge on the subject under investigation." *Id.* at 528 (emphasis in original). Observing that the standard of review for qualifying an expert witness rests within the sound discretion of the trial court and should not be overturned absent an abuse of discretion, the Supreme Court reversed the rulings of the trial court and this Court. Although the coroner was not a physician, the Supreme Court observed that he had been the county coroner for 15 years and a mortician for 27 years, for which the Commonwealth licensed him. Thus, the Court held that "the refusal to qualify Coroner Wetzler as an expert witness based solely upon his lack of formal medical training was an abuse of discretion." *Id.* at 529.

¶ 31 The holding in *Miller,* was discussed in *Flanagan v. Labe*, 446 Pa.Super. 107, 666 A.2d 333 (1995). *Flanagan* involved a medical malpractice action where a nurse was called to provide expert testimony on the issue of legal causation. In discussing this issue, this Court began its analysis by stating:

[a]lthough our courts have permitted non-medical practitioners to testify within their specialties, the scope of this testimony has not been expansive. In *Simmons v. Mullen*, 231 Pa.Super. 199, 208–10, 331 A.2d 892, 898 (1974), for example, a clinical psychologist was deemed competent to render expert testimony as to organic brain disturbances. *Id.* Nevertheless, the non-medical practi-

tioner was not qualified to testify as to causation. *Id.* at 212, 331 A.2d at 899–900. *See also Pratt v. Stein*, 298 Pa.Super. 92, 153, 444 A.2d 674, 706 (1982) (a professor of pharmacology, *i.e.*, the study of medications and their origin, nature, properties and effect on living organisms, was qualified to testify regarding the toxic nature of a drug proscribed (sic) by a doctor, the existence of alternative medications and the standard of care to be followed in dosage).

*Flanagan,* 666 A.2d at 336–337. In discussing the application of the holding in *Miller,* the *Flanagan* Court noted that:

[a]s an arm of the prosecution, a coroner is particularly suited to provide such testimony [regarding time of death]. [FN2] Specifically, a coroner is authorized by statute to conduct an "investigation . . . to determine the cause of any such death and to determine whether or not there is sufficient reason for the coroner to believe that any such death may have resulted from criminal acts or criminal neglect of persons other than the deceased." 16 P.S. § 1237(b). To properly carry out his duties and assess whether the death resulted from the tavern's negligence, the coroner in *Miller* was therefore required to ascertain the time of death.

FN2 Pursuant to statute,

(a) The coroner having a view of the body shall investigate the facts and circumstances concerning deaths . . . for the purpose of determining whether or not an autopsy should be conducted or an inquest thereof should be had, in the following cases:

. . . . .

(2) deaths occurring under suspicious circumstances, including those where alcohol, drugs or other toxic

substances may have had a direct bearing on the outcome;

(3) deaths occurring as a result of violence or trauma, whether apparently homicidal, suicidal or accidental. . . .

16 P.S. § 1237(a).

*Id.* at 337. Finding that the coroner's ability to render an expert opinion as to time of death was statutorily authorized, as opposed to the nurses' ability to formulate a medical diagnosis, which is statutorily forbidden, we held that the nurse could not offer an opinion as to legal causation. *Id.* at 337.

¶ 32 It is interesting to note that this Court in *Flanagan* relied on the coroner's statutory authority to offer an expert opinion of time of death. The statutory language of 16 P.S. § 1237(b) specifically states that "the purpose of the investigation shall be to determine the cause of death and to determine whether or not there is sufficient reason for the coroner to believe that any such death may have resulted from criminal acts or criminal neglect of persons other than the deceased." Indeed, if a coroner is unable to determine the cause and manner of death, then he shall perform an autopsy or order an autopsy on the body. 16 P.S. § 1238(a). If the coroner is still unable to determine the cause and manner of death following an autopsy, then an inquest may be conduct-

ed. 16 P.S. 1238(b). The difference between cause and manner of death has been explained as such:

> [t]his legislation makes a clear distinction between statements relative to the cause, and those concerning the manner, of a death; as to the former the statement is required to be 'definite,' but only 'probable' to the latter. The reason for the distinction is obvious. The cause of a death is usually established by the opinion testimony of medical experts, whereas a conclusion upon the question whether a death from 'external cause or violence' was 'accidental, suicidal, or homicidal,' may ordinarily be determined by a jury without the assistance of expert witnesses.

*Lederer v. Metropolitan Life Ins. Co.,* 135 Pa.Super. 61, 4 A.2d 608 (1939).[9]

¶ 33 In evaluating the evolution of this issue from *Buzard* to *Flanagan* and in light of the statutory authority, we conclude that *every* lay coroner is not entitled to offer an opinion as to the cause of death at trial.[10] For some, this would be an area simply out of their expertise and severe consequences could result by a blind application of such a rule.[11] Rather, as with any expert witness, one would first have to be properly qualified by the party calling that witness and accepted as an expert by the trial court.

---

9. Although this language is dicta, it is nonetheless instructive in resolving this issue.

10. We are not commenting on the statutory language other than to say that the legislative authority of a lay coroner to determine the cause of death does not extend automatically to criminal and civil legal arenas where requisite burdens of proof must be met. For example, *see Commonwealth v. Martin,* 727 A.2d 1136 (Pa.Super.1999) (an inquest is only a preliminary investigation and not a trial on the merits; the coroner's findings are binding on no one as a judgment).

11. For example, in this case if the facts indicated that the accident occurred on the center line instead of the victim's fog line, who could say that the victim did not have a heart attack and swerve into Appellant's lane? The impact would produce the same outward injuries but without an autopsy, no one would know that a heart attack occurred. Thus, we urge trial courts to use caution in qualifying lay coroners as experts on cause of death based on their qualifications and the facts of the case.

¶ 34 Presently, Cahill testified that he is a funeral director and a deputy coroner. N.T., 5/11/99, morning session, at 72. He stated that he had held the deputy coroner position since 1984. *Id.* He also testified that he had been a licensed mortician for sixteen years. He received a degree from the Pittsburgh Institute of Mortology Science. *Id.* Further, he attended the University of Pittsburgh for three years, where he studied anatomy, physiology, pathology, and histology. *Id.* at 74. He testified that his duties as a deputy coroner required him to investigate hundreds of deaths, some of which were the result of automobile accidents. *Id.* at 75, 77.

¶ 35 In regard to the decedent in this case, Cahill testified that he examined the victim at the scene to check for a pulse and lividity of the blood. *Id.* at 80. It was determined that the victim was dead. After the victim's body was transported to Bradford Regional Medical Center, Cahill conducted a more thorough examination. The victim's clothes were removed and extensive hemorrhaging from the mouth, head, ears and nose was observed. *Id.* at 82. His chest and abdomen were "very spongy to the touch and palpitation." *Id.* Based on his experience and examination, Cahill opined that the cause of death was blunt force injuries caused by the accident. *Id.* at 83. We do not find that the trial court abused its discretion in finding Cahill qualified to render an expert opinion. It is clear that his many years of experience as both mortician and the deputy coroner, combined with his education, gave him a pretension of specialized knowledge on the subject matter in question, qualifying him as an expert.

¶ 36 Appellant's next argument alleges that the opinion offered by Cahill was insufficient to sustain the Commonwealth's burden of proving the causation element of homicide by vehicle while driving under the influence. Appellant relies on *Commonwealth v. Baker, supra,* to support her position. However, we find Appellant's reliance to be misplaced. In *Baker,* the lay coroner merely performed a cursory evaluation of the decedent at the scene and in the dark. However, in this case after an initial on-scene examination was performed, the victim was then transported to the hospital where a thorough examination was performed. As opposed to the coroner in *Baker,* at trial Cahill supported his assertions as to the cause of death with the physical description. These factors easily distinguish *Baker.*

¶ 37 Even if Appellant's contention regarding Cahill's testimony was correct or if the testimony had been excludable, the Commonwealth still proved the causation element of the offense beyond a reasonable doubt. "The element of causation can be established through eyewitness testimony, skidmarks, or accident reconstruction testimony." *Commonwealth v. McCurdy,* 558 Pa. 65, 735 A.2d 681, 686 (1999) (citing *Commonwealth v. Lenhart,* 520 Pa. at 193, 553 A.2d at 911). In the case *sub judice,* the testimony established that Appellant was travelling in the opposite direction of the victim when she collided with the front driver's portion of his car. N.T., 5/11/99, morning session, at 109. Testimony revealed that the accident occurred when Appellant crossed over the centerline and struck the victim on the white fog line of his side of the road. N.T., 5/10/99 afternoon session, at 51. This testimony is sufficient to prove causation. *See also Commonwealth v. Hess,* 446 Pa.Super. 222, 666 A.2d 705 (1995), *appeal denied,* 544 Pa. 603, 674 A.2d 1067 (1996) (evidence was sufficient to establish causation where the defendant's vehicle crossed the center line causing the accident that killed the victim); *Commonwealth v. Urbanski,* 426 Pa.Super.

505, 627 A.2d 789 (1993), *appeal denied*, 535 Pa. 657, 634 A.2d 221 (1993) (defendant's erratic driving over wife's protests combined with a BAC of .215% was sufficient to establish causation of wife's death). Hence, we conclude the evidence was sufficient to establish that Appellant's conduct in drunk driving, crossing over the center line, colliding with the victim on the fog line of his side of the roadway, thereby causing his death, was sufficient to establish the causation element of homicide by vehicle while driving under the influence.

■ ¶ 38 Appellant's seventh argument contends that the trial court erred in admitting the relation back testimony of the Commonwealth's expert, Dr. Blanding. The law regarding the necessity of relation back testimony at the time Appellant's charges arose is as follows:

> ... once the Commonwealth has established that the driver's blood alcohol content reflects an amount above 0.10%, the Commonwealth has made a *prima facie* case under 75 Pa.C.S. § 3731(a)(4). At this point, the defendant is permitted to introduce expert testimony to rebut the Commonwealth's *prima facie* evidence. If the defendant decides to rebut the *prima facie* evidence against him with expert testimony, then the Commonwealth may present its own expert to refute this testimony.

*Commonwealth v. Yarger*, 538 Pa. 329, 648 A.2d 529 (1994).[12] Appellant's BAC test results indicated a level of .19%, a level significantly higher than .10%. The test results were taken approximately 2½ hours after Appellant last drove. Thus, contrary to Appellant's assertion, by admitting this evidence the Commonwealth had established a *prima facie* case and was not even required to present an expert for relation back testimony.[13]

■ ¶ 39 Alternatively, Appellant argues that if we determine that relation back evidence was *not* necessary, that she rebutted the *prima facie* evidence that her BAC was above .10% at the time she operated her vehicle. She argues that the testimony of her expert witness should have been relied upon instead of that of the Commonwealth's expert witness, as the latter's testimony was "unreliable." This argument goes to the credibility determination made by the jury, a finding that will not be usurped by an appellate court. "Whether an expert's testimony is persuasive beyond a reasonable doubt is a matter for the jury's consideration." *Commonwealth v. Stallworth*, 566 Pa. 349, 781 A.2d 110 (2001). Therefore, this argument is without merit.

■ ¶ 40 Lastly, Appellant argues that the trial court erred in allowing the Commonwealth to admit a videotape. The videotape was created to refute Appellant's proffered defense that the accident was not caused by her drunk driving but rather due to a mechanical failure of her vehicle when the ball joint became dislodged. On this subject, Appellant presented an expert witness, and in rebuttal the Commonwealth presented one of its own. The Commonwealth's expert had conducted an experiment that recreated a scene where a ball joint identical to that on Appellant's vehicle dislodged. The video explained what a ball joint looks like and what would occur when it dislodged. Appellant contends that the video should not have been admitted because the circumstances of the

---

12. The provisions of 75 Pa.C.S.A. 3731(a.1), which allow a test result within three hours of driving to constitute *prima facie* evidence of driving under the influence had not yet been enacted.

13. Nonetheless, both the Commonwealth and Appellant opted to present expert testimony on this subject.

experiment shown in the videotape demonstrates that it was not made under conditions sufficiently close to those at the time of the accident and that she was prejudiced by its admission.

¶ 41 The decision to admit or exclude evidence is within the discretion of the trial court, and will not be reversed absent an abuse of that discretion. *Commonwealth v. Wyatt*, 455 Pa.Super. 404, 688 A.2d 710 (1997), *appeal denied*, 548 Pa. 681, 699 A.2d 735 (1997). Test results of experiments are admissible if conditions under which the experiment was conducted are "substantially similar" to conditions involved in the commission of the crime charged. *Commonwealth v. Sero*, 478 Pa. 440, 387 A.2d 63 (1978) "Reversal based on the exclusion of evidence requires a showing of abuse of discretion *as well as a showing of actual prejudice.*" *Wyatt, supra*, 688 A.2d at 714 (emphasis added).

¶ 42 We need not determine whether the conditions under which the experiment was preformed were substantially similar to those that existed at the time of the accident or whether trial court abused its discretion in admitting the video because we find that Appellant can not demonstrate prejudice as required. First, we note that Appellant fully cross-examined the Commonwealth's expert regarding any differences in the conditions.[14] Second, the evidence at trial was that Appellant's BAC was above the legal limit when she collided with the victim. The jury weighed the evidence and found that Appellant's driving under the influence resulted in the victim's death, and was convinced beyond a reasonable doubt. In our view, the defense that the ball joint dislodged and caused the accident was specious at best, and rejected by the jury as it was entitled to do. Appellant cannot demonstrate how differences in the experiment prejudiced her so as to affect the outcome of the case when the jury rejected her theory of the case and evidence beyond a reasonable doubt supported her conviction. Consequently, she cannot demonstrate prejudice. Thus, we find this argument to be meritless.

¶ 43 In conclusion, we find that Appellant has not presented any arguments that would entitle her to relief. Accordingly, we affirm the judgment of sentence.

¶ 44 Judgment of sentence affirmed.

14. Interestingly, some of the alleged differences in the conditions were based on assumed events since Appellant testified that she could not recall the accident. For example, Appellant argues that the experimental ball joint dislodgment was not conducted when the vehicle was traveling at 55 miles per hour. However, Appellant cannot state that she was traveling at 55 miles per hour since she does not remember. The Commonwealth's witness assumed that was the speed of both the victim and Appellant's vehicles since that was the posted speed limit.