**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 95 MAP 2024 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Superior Court at No. 554 MDA |
| | : | 2023, entered on May 17, 2024, |
| v. | : | Affirming and Reversing the Order |
| | : | of the York County Court of |
| | : | Common Pleas, Criminal Division, |
| JOSEPH BERNARD FITZPATRICK, III, | : | at No. CP-67-CR-0002534-2014, |
| | : | entered on March 20, 2023 |
| Appellant | : | |
| | : | ARGUED: October 8, 2025 |

**OPINION**

**JUSTICE WECHT**                    **DECIDED: January 21, 2026**

There is a "material distinction between cause and manner of death, with the former referring to the immediate physiological processes that precipitate the death of an individual and the latter speaking to the broader context of the surrounding circumstances and events that preceded and contributed to those fatal physiological processes."[1] Put simply, cause of death refers to the "happening, occurrence, or condition that makes a person die" or the "injury, disease, or medical complication that results directly in someone's demise."[2] In a murder case, for instance, the cause of a victim's death might

---

[1]     *Reibenstein v. Barax*, 286 A.3d 222, 225-26 (Pa. 2022).

[2]     *Cause of Death*, BLACK'S LAW DICTIONARY (12th ed. 2024); s*ee also* Dan Simon, *Minimizing Error and Bias in Death Investigations*, 49 SETON HALL L. REV. 255, 266 (2019) (defining "cause of death" as "the physical antecedent of death, such as disease or injury").

be asphyxiation by strangulation, exsanguination from a gunshot wound, or organ failure caused by blunt force trauma. Manner of death explains the cause of death.[3] It takes into account "external factors"[4] and the "broader circumstances by which the death was brought about."[5] Manner of death classifications must fall into one of five categories: "natural, accident, homicide, suicide, [or] undetermined."[6]

Although cause of death and manner of death often are introduced hand-in-hand in criminal cases, proof of one is not proof of the other. More importantly, the methods for these proofs can differ. In view of the complexity and interrelated workings of the human body, expert testimony from a medical professional is needed to establish cause of death.[7] By contrast, manner of death "may ordinarily be determined by a jury without the assistance of expert witnesses."[8]

Nonetheless, prosecutors very often do present expert testimony to establish the manner of a murder victim's death. The question we confront here is whether, in the event such expert testimony—even though not required by law—is presented, must it comply with the legal standards that apply to all expert testimony? The answer, unequivocally, is yes.

---

[3]   See *Manner of Death*, BLACK'S LAW DICTIONARY (12th ed. 2024) (defining "manner of death" as "[t]he circumstances under which the cause of death arose").

[4]   Keith A. Findley & Dean A. Strang, *Ending Manner-of-Death Testimony and Other Opinion Determinations of Crime*, 60 DUQ. L. REV. 302, 304 (2002).

[5]   Simon, *supra* note 2, at 266.

[6]   *Id.*

[7]   *See also Commonwealth v. Brown*, 139 A.3d 208, 220 (Pa. Super. 2016) (stating that Pennsylvania "precedent requires that an expert opinion be offered to prove the cause of death")*, aff'd,* 185 A.3d 316 (Pa. 2018).

[8]   *Commonwealth v. Smith*, 808 A.2d 215, 229 (Pa. Super. 2002) (citation omitted); *see also Brown*, 139 A.3d at 217 n.18 (explaining that, under Pennsylvania law, "expert testimony [is not] necessary to prove the manner of" death).

<u>Background</u>

Before discussing the law that leads us to that conclusion, it is important here to recall the circumstances of this case, particularly for the benefit of readers who encounter it here for the first time.

On June 6, 2012, Annemarie Fitzpatrick drowned in Muddy Creek, a tributary of the Susquehanna River.  Two years later, Annemarie's husband, Joseph Fitzpatrick, was charged with, and convicted of, her murder.  We previously offered the following summary:

> On June 6, 2012, Fitzpatrick and Annemarie were riding on an all-terrain vehicle ("ATV") through a deep part of Muddy Creek, [which] runs near their home in Chanceford Township, York County, Pennsylvania.  According to Fitzpatrick, at some point during their trek, the vehicle flipped backwards and tossed both riders into the creek.  Although Fitzpatrick managed to climb out of the water relatively unscathed, in his version of events, Annemarie could not.  Fitzpatrick claimed that he called 911 after he initially was unable to locate Annemarie in the water.  While on the line with a dispatcher, Fitzpatrick allegedly saw Annemarie's body floating nearby on the side of the creek opposite from where he was standing.
>
> Pennsylvania State Police ("PSP") troopers and emergency medical technicians ("EMT") responded to the scene.  Fitzpatrick—who presented no obvious signs of injury and refused medical treatment—told a PSP trooper that, when he located Annemarie, he dove into the creek, removed her body from the water, and began to perform CPR.  The EMTs took over the resuscitation efforts.  Once the EMTs were able to restart Annemarie's pulse, they immediately transported her to the local hospital.  A short time later, Annemarie died.  The York County Coroner's Office determined that the cause of Annemarie's death was drowning.  Upon further determining that an autopsy was not necessary at that time, the Coroner's Office released Annemarie's body to a mortician, who embalmed her remains.
>
> At first, the PSP investigators uncovered no evidence of foul play.  By all initial accounts, it appeared to the authorities that Annemarie had died in an ATV accident on June 6.  Two days later, things changed dramatically.  On June 8, 2012, the PSP received a telephone call from Rebekah Berry, one of Annemarie's co-workers at Collectibles Insurance Services, a business that is located across the state line in Hunt Valley, Maryland.  This call transformed the case into a murder investigation, with Fitzgerald being the lead suspect.

Berry told PSP investigators that her co-workers had found a day planner on Annemarie's desk. Annemarie had left a note in the day planner that read, "06/05/12. If something happens to me—JOE." Annemarie had personally signed the note. After reviewing the note, PSP personnel obtained access to Annemarie's password-protected work email account. The troopers discovered that, at 10:30 a.m. on June 6, 2012, the day she died, Annemarie sent an email from her work email account to her personal email account, "feltonfitz@gmail.com." In the subject line of the email, Annemarie wrote, "if something happens to me." In the body of the message, Annemarie stated, "Joe and I are having marital problems. Last night we almost had an accident where a huge log fell on me. Joe was on the pile with the log and had me untying a tarp directly below."

That same day, PSP investigators interviewed Fitzpatrick at a PSP barracks. Fitzpatrick related that he and Annemarie went to Muddy Creek to have a waterside picnic in celebration of their wedding anniversary. During dinner, Fitzpatrick drank three beers. Annemarie had a glass of wine. After they ate, Fitzpatrick and Annemarie wanted to start a campfire, but they had left the propane torch needed to ignite the fire back at their house. They climbed onto the ATV, with Annemarie in the driver's position and Fitzpatrick the passenger. Annemarie, who, according to Fitzpatrick, was inexperienced in driving ATVs, started toward the house to get the torch, with Fitzpatrick behind her.

Fitzpatrick told the PSP that, due to his wife's limited ability operating ATVs, he had to reach around Annemarie to assist her with the controls. He explained that he reached around her left side to shift gears and around her right side to throttle the vehicle. Fitzpatrick claimed that, when he twisted the throttle, the ATV shot forward and flipped them both backwards into the water.

As the interview progressed, however, Fitzpatrick's version of the events began to change. For instance, he retracted his statement that he had shifted the gears and twisted the throttle. He proceeded now to state that he believed that it had to be Annemarie who did so, because he no longer could remember reaching around and assisting her. He claimed that his memory of the accident was limited, and that he could only recall driving into the creek in a diagonal direction.

Regarding the accident, Fitzpatrick explained that the front of the ATV rose slowly—more like a tilt than a rapid ascent, as one might see when a driver performs a wheelie—before it flipped over backwards. He then told the troopers that, when he emerged from the water, the rear tire of the ATV was near his head. The vehicle was almost entirely submerged. He tried to move the ATV, but could not do so because so much of it was under water. Fitzpatrick looked around but could not see any sign of Annemarie. After several minutes of searching for her, he placed the 911 call. He told the

police that it was during the call that he spotted Annemarie's body floating near the opposite shore.

Fitzpatrick walked away from the incident relatively unscathed. He informed the troopers only that he felt some soreness in his legs. Otherwise, the accident that had caused Annemarie to drown had left him almost entirely uninjured.

Notably, Fitzpatrick told the PSP investigators that he and Annemarie were not experiencing any marital problems on or before June 6, 2012.

Meanwhile, on June 8, 2012, PSP troopers executed a search warrant on Fitzpatrick's residence. While on the property, the investigative team observed a large woodpile in a field behind the house. The stack of wood was partially covered by a blue tarp. On one side of the pile, there was clear evidence that a log had fallen off the pile. The investigators located an impression in the mud that they believed likely was caused by a fallen log, which also was surrounded by loose bark. These findings corroborated Annemarie's June 6 email message.

During the initial investigation on the night of Annemarie's death, a trooper had observed Annemarie's cell phone on a picnic table near the creek where she drowned. During the execution of the search warrant on June 8, 2012, PSP investigators tried to locate that phone, but were unsuccessful. They asked Fitzpatrick about the phone, but he claimed that he did not know where it was located. He suggested that he and his brother might have thrown it in the garbage when they were cleaning up the residence during the two days following Annemarie's death. Fitzpatrick told the troopers that he would let them know if he found the phone. This turned out to be untrue. As noted below, Fitzpatrick concealed the phone in order to cover up the fact that Annemarie had learned that he was engaged in an extramarital affair.

On June 9, 2012, three days after Annemarie's death and in light of the newly uncovered suspicious circumstances surrounding the drowning, authorities decided to have Annemarie's body autopsied. Barbara Bollinger, M.D., a forensic pathologist, conducted the autopsy at the Lehigh Valley Hospital. Dr. Bollinger determined that Annemarie had drowned, and concluded that the circumstances surrounding her death were suspicious. However, Dr. Bollinger could not determine the manner of death with any degree of certainty. During the examination of Annemarie's body, Dr. Bollinger found injuries to the head, neck, torso, buttocks, right and left hands, right and left arms, right and left legs, right elbow, right forearm, left thigh, left knee, and lower back. Additionally, one of Annemarie's ribs had been broken. Notwithstanding Fitzpatrick's assertion that Annemarie had consumed a glass of wine during dinner on the night she died, a toxicology report showed no traces of alcohol or drugs in her system.

As the investigation unfolded, PSP troopers continued to suspect that Annemarie's death might not have been an accident. Investigators learned that much of Fitzpatrick's statement to them was not truthful. For instance, contrary to his claim that he and Annemarie were not experiencing marital problems, Fitzpatrick had been engaging in an affair with a woman named Jessica Georg. In emails and other communications, Fitzpatrick told Georg that he loved her and that he was going to end his marriage with Annemarie in order to be with her.

On June 2, 2012—four days before Annemarie died—Georg told Fitzpatrick that, if he wished to share a relationship with her, he would have to end his marriage. Fitzpatrick agreed, and he committed to discussing the matter with Annemarie. According to Georg, Fitzpatrick decided that, on the night of June 6, he was going to discuss a separation with Annemarie, and this was to be followed by a divorce. But on June 7, Fitzpatrick abruptly directed Georg to delete any Facebook messages between them and told her that the police might be interested in speaking with her. Fitzpatrick later admitted that he had hidden Annemarie's cell phone (the one that PSP troopers had searched for on his property) in an effort to conceal the affair from authorities.

The PSP also learned that Fitzpatrick was the beneficiary of Annemarie's life insurance policy. Under the policy's terms, upon Annemarie's death, Fitzpatrick would receive over $1.7 million dollars. Eventually, investigators searched Fitzpatrick's personal computer and reviewed his internet activity. They found that, on June 1, 2012—five days before Annemarie's death— Fitzpatrick had conducted an online search for "life insurance review during contestability period." Notes of Testimony ("N.T."), 5/4/2015-5/13/2015, at 918. Four days later, he performed an online search for "polygraph legal in which states." *Id.*

Corporal Andrew Thierwechter, a PSP accident reconstructionist, attempted to reenact the accident in Muddy Creek according to Fitzpatrick's version of the events. Using forensic mapping, measurements, and simulations with an actual ATV, Corporal Thierwechter determined that, had the incident occurred in accordance with Fitzpatrick's account, both he and Annemarie would have been subjected to similar forces when the ATV flipped over. In Corporal Thierwechter's view, either both riders would have suffered similar injuries, or neither would have been injured at all. Corporal Thierwechter concluded that there was no reasonable way to explain how Annemarie could have suffered such significant injuries while Fitzpatrick suffered essentially none. Nor could he ascertain any reasonable explanation for how Fitzpatrick awoke next to the submerged ATV while Annemarie ended up on the other side of the creek.

[Fitzpatrick's murder case] originally was assigned to the Honorable Gregory M. Snyder. Prior to trial, Fitzpatrick filed an omnibus pre-trial

motion, asserting, *inter alia*, that both the note written in Annemarie's day planner and the email that she had sent from her work email account to her private account were inadmissible hearsay and were not otherwise admissible under any established hearsay exception. The Commonwealth conceded that both statements were hearsay, but argued that the statements nonetheless were admissible as substantive evidence under the state of mind hearsay exception. *See* Pa.R.E. 803(3). Judge Snyder agreed with the Commonwealth, ruling that both statements were admissible. Thereafter, Judge Snyder was reassigned to the Family Division of the York County Court of Common Pleas. Fitzpatrick's case was transferred to the Honorable Richard K. Renn for trial.[9]

At trial, the primary bone of contention between the parties was the manner of Annemarie's death. Fitzpatrick maintained that Annemarie had drowned after an ATV accident, while the Commonwealth alleged that her death was a homicide. In light of this disagreement, particular significance attached to Dr. Bollinger's testimony, which we previously recounted as follows:

> Dr. Bollinger testified that, to a reasonable degree of medical certainty, the cause of Annemarie's death was drowning. While this conclusion was not disputed by the parties, the manner of death remained a central point of contention. With the assistance of charts and diagrams, Dr. Bollinger detailed for the jury the more than twenty-five injuries suffered by Annemarie. Dr. Bollinger opined that all of these injuries were the result of blunt force trauma. However, she explained as well that such trauma may have been inflicted during the resuscitation attempts or during the embalming process, which occurred prior to the autopsy. On cross-examination, Dr. Bollinger stated that the existence of injuries caused by blunt force trauma does not, *ipso facto*, mean that a criminal act caused those injuries.

> At trial, Dr. Bollinger could not offer a definitive opinion on the manner of death. She explained that Annemarie's injuries *could have* been caused by being held underwater until she drowned. Because Fitzpatrick was the only person in the water with Annemarie, only he could have done that to her. In Dr. Bollinger's view, that made the death at least suspicious. However, Dr. Bollinger could not opine whether that, in fact, is what happened. She testified that none of the more than twenty-five injuries were indicative of any specific type of assault. Instead, she opined, Annemarie's injuries were "consistent with an accident," N.T. at 547, and that it was "possible" that those injuries were consistent with being held under water. *Id.* at 564. On

---

[9]       *Commonwealth v. Fitzpatrick*, 255 A.3d 452, 459-62 (Pa. 2021).

re-cross-examination, defense counsel asked Dr. Bollinger the following question: "Dr. Bollinger, do you *equally* agree that all of the injuries that you've described in depth here over the last few questions could also be caused as a result of an ATV accident?" *Id.* at 564-65 (emphasis added). Dr. Bollinger responded: "That is also possible." *Id.* at 565.

Fitzpatrick testified in his own defense. As he did when interviewed by PSP investigators, Fitzpatrick maintained that Annemarie had died in an ATV accident. Fitzpatrick told the jury that Annemarie must have inadvertently placed the vehicle in the reverse gear, such that when she accelerated the ATV flipped backwards, sending them both into the water. Fitzpatrick denied killing Annemarie intentionally.[10]

On March 13, 2015, the jury found Fitzpatrick guilty of first-degree murder. That same day, the trial court sentenced him to life in prison without the possibility of parole. On May 22, 2015, Fitzpatrick filed post-sentence motions. He argued, *inter alia*, that the Commonwealth's evidence was insufficient as a matter of law to prove that Annemarie had been murdered.[11] Following a hearing, the trial court agreed.

Even viewing the evidence in the light most favorable to the Commonwealth, the trial court held, the Commonwealth had failed to prove, beyond a reasonable doubt, that Annemarie's death had been a homicide. "[A]t best, the Commonwealth showed [that Fitzpatrick] had motive to kill his wife and perhaps even specific intent to kill his wife."[12] The problem, the trial court concluded, was that this evidence "in no way prove[d] beyond a reasonable doubt that an unlawful killing occurred."[13] "[F]or the jury to conclude that

---

[10]     *Id.* at 462-63 (citations modified).

[11]     Fitzpatrick also argued that the verdict was against the weight of the evidence and that Annemarie's note and email constituted inadmissible hearsay. *See id.* at 464.

[12]     Trial Court Opinion ("T.C.O."), 9/1/2015, at 7.

[13]     *Id.*

Annemarie Fitzpatrick was unlawfully killed," the court opined, the jury had no choice but to "speculate that something untoward occurred at the creek."[14]

Dr. Bollinger's expert testimony took center stage in the trial court's analysis. Throughout her testimony, Dr. Bollinger expressed her belief that Annemarie's injuries could have been caused by falling from the ATV by accident, or from being held underwater by Fitzpatrick, or from the EMTs' resuscitation attempts, or even from the embalming process. All told, the trial court found, Dr. Bollinger testified that any of a handful of equally possible and conjectural mechanisms could have caused the injuries, a proposition which, in and of itself, precluded a finding of proof beyond a reasonable doubt.

The trial court observed that, at the post-sentence motions hearing, when asked to explain how Annemarie was killed, the Commonwealth responded with "a period of rather telling silence."[15] Although the Commonwealth could not offer an "articulable, evidence-based theory of how Annemarie died,"[16] the trial court nonetheless considered whether the balance of the Commonwealth's evidence established the manner of Annemarie's death beyond a reasonable doubt. The court focused on nine items of evidentiary value.

First, the court considered Corporal Thierwechter's accident reconstruction testimony. The court found that, at most, Corporal Thierwechter's testimony "served only

---

[14]     *Id.*

[15]     *Id.* at 10.

[16]     *Fitzpatrick*, 255 A.3d at 465.

to disprove Fitzpatrick's version of events, and little more."[17]  The trial court stressed that disproof of one theory is not affirmative proof of another, at least not beyond a reasonable doubt.[18]  The court then evaluated the following eight items:

1.      A handwritten note reading "If something happens to me -- Joe."  The note is dated June 6, 2012, the date Annemarie died, and it is signed by her.

2.      An email sent from Annemarie's work email address to her home email address with the subject line "If something happens to me."  The body of the email reads, "Joe and I are having marital problems.  Last night we almost had an accident where a huge log fell on me.  Joe was on the pile with the log and had me untying a tarp directly below."  This email was also sent June 6, 2012, the day she died.

3.      $1.7 million dollar insurance policies that [Fitzpatrick] would receive upon his wife's death.  At trial, the parties stipulated that Annemarie, who worked in insurance, took out all of these policies years before her death.

4.      A non-sexual, extramarital affair between [Fitzpatrick] and Jessica Georg.  Ms. Georg testified that she met [Fitzpatrick] in late April 2012.  In their many pages of text messages, emails, and Facebook communications, Ms. Georg testified that [Fitzpatrick] never spoke an ill word about his wife.  In fact, he always spoke very highly of her and contemplated Annemarie being in his life for a long time because of their two children.  Annemarie was also aware of the affair before she died.

5.      Two Google searches conducted on [Fitzpatrick's] work computer.  The first one inquired about insurance contestability periods and the second one inquired about states [in which] polygraph tests are admissible.  Both of these searches happened within the few days before Annemarie's death.

6.      [Fitzpatrick's] lie to the police concerning the whereabouts of Annemarie's cell phone.  [Fitzpatrick] testified that he concealed the phone from the police because he did not want them finding out about the affair.

_____

17      *Id.* at 466.

18      T.C.O., 9/1/2015, at 10.

7. [Fitzpatrick's] inconsistent statements about what happened on the night of June 6, 2012. [Fitzpatrick] initially told investigators he and Annemarie were down at the creek to celebrate their anniversary. He later said that they went down to discuss the state of their marriage. The Commonwealth states in its brief that [Fitzpatrick] initially stated he put the ATV into gear and then later said it was Annemarie.

8. The house. There was also mention of [Fitzpatrick's] love for his home that he built from the ground up, implying that [Fitzpatrick] killed Annemarie because he did not want to lose the house. However, there was no evidence presented to show that [Fitzpatrick] would lose the house in a divorce or that he would not be able to afford the house without Annemarie's income.[19]

While much of this evidence rendered Fitzpatrick "suspect" and "did not cast [Fitzpatrick] in the most positive light,"[20] the trial court concluded that the jury had been required to venture a guess as to the manner of Annemarie's death. The court opined that the jury's verdict was based upon "mere suspicion," and that "gut feelings" are not substitutes for evidentiary proof.[21] The trial court expressed "serious and real concerns about the jury's verdict," so much so that it granted Fitzpatrick's motion for a judgment of acquittal and awarded him a new trial. The court concluded: "If Fitzpatrick did unlawfully kill another human being, the Commonwealth did not prove it."[22]

Upon the Commonwealth's appeal, the Superior Court reversed the trial court's order.[23] The panel described in detail the extent of Annemarie's injuries and then noted that Dr. Bollinger had testified, to a reasonable degree of certainty, that Annemarie's

---

[19] *Id.* at 11-13 (citations to Notes of Testimony omitted).

[20] *Id.* at 14.

[21] *Id.*

[22] *Id.* at 15.

[23] *Commonwealth v. Fitzpatrick*, 159 A.3d 562, 564 (Pa. Super. 2017). Fitzpatrick also appealed. However, because he was awarded a new trial, the Superior Court held that Fitzpatrick was not an aggrieved party, and, thus, quashed his appeal. *Id.* at 572.

injuries *could* have been caused by being held underwater until she drowned. Dr. Bollinger also had testified that the lack of injuries to Fitzpatrick was inconsistent with his version of events, *i.e.*, an ATV accident. Viewed in the light most favorable to the Commonwealth, the panel ruled, the evidence demonstrated that Annemarie was killed unlawfully. The panel emphasized that Fitzpatrick was the only person with Annemarie when she was killed, which conclusively demonstrated that he was the only possible person that could be responsible for her death. Finally, the panel explained, there was ample evidence to prove that Fitzpatrick had the specific intent to kill, including his participation in an extra-marital relationship, his concern about losing his house in a divorce from Annemarie, and the fact that he stood to gain a substantial amount of insurance money upon Annemarie's death.[24] The court vacated the trial court's order and remanded the case.

On remand, the trial court reinstated Fitzpatrick's life sentence. Fitzpatrick again submitted post-sentence motions. After those motions were denied, he filed another appeal to the Superior Court. At issue in that appeal was the admissibility of the note that Annemarie wrote in her day planner ("If something happens to me—JOE") and the email that she sent to herself ("if something happens to me . . . Joe and I are having marital problems. Last night we almost had an accident where a huge log fell on me. Joe was on the pile with the log and had me untying a tarp directly below"). The Superior Court

---

[24]     *Id.* at 569-70.

held that the note was admissible under the state-of-mind hearsay exception[25] but that the email constituted an inadmissible out-of-court statement of Annemarie's belief.[26]

We granted allowance of appeal[27] in order to decide "whether the note that Annemarie wrote in her day planner . . . satisfies the state of mind hearsay exception."[28] We observed that Annemarie's statement was not an ordinary state-of-mind declaration, but was instead a "compound statement that both demonstrates the speaker's then-existing state of mind[,] and, when offered for the truth of the matter asserted, proves a fact that, if considered on its own, would be inadmissible hearsay."[29] That is, simultaneously, Annemarie's note both expressed her state of mind, *i.e.*, her fear of Fitzpatrick, which would be admissible under Pa.R.E. 803(3), and identified Fitzpatrick as her killer, an inadmissible out-of-court factual assertion.[30] We held that hearsay statements that contain both a state of mind component and a "fact-bound"[31] component generally are inadmissible, unless both components of the statement independently

---

[25] *Commonwealth v. Fitzpatrick*, 204 A.3d 527, 532 (Pa. Super. 2019). Contradicting itself, the Superior Court simultaneously held that the note was not offered for the truth of the matter asserted, and, thus, was not hearsay. *Id.*; *see also* Pa.R.E. 803(3) (excluding statements of a person's then-existing state of mind from the rule prohibiting hearsay unless it is "a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will").

[26] *Id.* at 533.

[27] *Commonwealth v. Fitzpatrick*, 223 A.3d 1287 (Pa. 2020) (*per curiam*).

[28] *Fitzpatrick*, 255 A.3d at 470-71.

[29] *Id.* at 472.

[30] *Id.* at 472-73.

[31] *Id.* at 480 (quoting *Commonwealth v. Moore*, 937 A.2d 1062, 1070 (Pa. 2007)).

satisfy a hearsay exception.[32]  Annemarie's note was inadmissible because the factual component identifying Fitzpatrick as her killer was hearsay that did not fall within any recognized exception.[33]

Having found error, we then inquired as to whether that error was harmless.  Such an analysis required us to assess only the uncontradicted evidence of guilt in order to determine whether that quantum of unchallenged evidence was so overwhelming that the evidentiary error "could not have contributed to the verdict."[34]  We recalled that the "main issue in this case was whether Annemarie died accidentally or whether she was murdered by Fitzpatrick."[35]  We emphasized that the "evidence pertaining to the *manner* in which she died was contested, and contradicted, at trial in a number of ways . . . .":[36]

> Most notably, Dr. Bollinger, the forensic pathologist who performed the autopsy on Annemarie's body, could not opine with a reasonable degree of certainty on the manner of death.  Dr. Bollinger repeatedly testified that the significant blunt force trauma suffered by Annemarie could have been caused by Fitzpatrick holding her under the water or by the impact of an ATV accident.  Under questioning from defense counsel, Dr. Bollinger admitted that it was equally possible that either of these scenarios caused the injuries.  She went as far as to hypothesize that Annemarie's injuries also could have resulted from the efforts to resuscitate her at the scene, or even from the embalming process.  No one at trial definitively could explain precisely how Annemarie died.
>
> Because Dr. Bollinger's testimony was disputed and inconclusive, the Commonwealth was forced to attempt to prove the manner of death with circumstantial evidence.  That evidence was not so overwhelming as to negate the prejudicial impact of the note.  Significantly, Corporal

---

[32]    *Id.* ("That one aspect of a statement is admissible does not render all of a multi-part statement admissible.  Quite to the contrary, both components must independently be admissible.").

[33]    *Id.* at 482-83.

[34]    *Id.* at 484 (citation omitted).

[35]    *Id.*

[36]    *Id.* (emphasis in original).

Thierwechter's accident reconstruction opinion testimony did not prove Annemarie's manner of death. As [the trial court] noted, at best, Corporal Thierwechter's expert opinion served to disprove Fitzpatrick's versions of events, as provided in his pre-trial statements to PSP investigators and in his trial testimony. Disproof of one theory is not the equivalent of affirmative proof of another.[37]

After the dust settled, all that remained was evidence that Fitzpatrick had both the motive and the opportunity to kill Annemarie. In light of the "significant prejudice injected into a trial by evidence such as Annemarie's note and the heavy emphasis placed upon it by the prosecutor,"[38] we deemed the uncontradicted evidence insufficient to overcome the prejudicial impact of the error.[39] We were not convinced—beyond a reasonable doubt—that the trial court's erroneous ruling was harmless. Thus, we remanded the matter to the trial court for a new trial.

On April 21, 2022, upon remand, the Commonwealth filed a "Motion for a Date Certain and Judge Certain Trial." Due to the anticipated length and complexity of the trial, as well as the significant number of witnesses that the Commonwealth intended to call, some of whom were expert witnesses, the Commonwealth sought an order setting a firm trial date before the original trial judge. The trial court scheduled a pretrial conference to discuss the motion, this Court's evidentiary ruling, outstanding discovery or motion issues, and any other matters that required pre-trial disposition.[40] The trial court also directed the Commonwealth to be prepared to advise the court on "what additional evidence or witnesses, if any, it intends to present at a re-trial which was not previously presented" and "[w]hether demonstrations or recreations of how the ATV went into the water are

---

[37] *Id.* at 484-85.

[38] *Id.* at 485.

[39] *Id.*

[40] Supplemental Order Scheduling Pre-Trial Conference, 4/26/2022, at 1-2.

admissible, given the apparent dissimilarities between such recreations and the actual events."[41]

On May 6, 2022, the Commonwealth filed a memorandum in anticipation of the pre-trial conference. The Commonwealth stated that it intended to call two new witnesses, Pamela Gay, the York County Coroner, and James Caruso, M.D., an expert witness who would opine on the manner of Annemarie's death.[42] The Commonwealth also addressed the trial court's concerns over the admissibility of the demonstrative evidence related to the recreation of the ATV accident. At Fitzpatrick's initial trial, Corporal Thierwechter, the PSP accident reconstructionist, had provided expert testimony for the Commonwealth. Corporal Thierwechter had simulated the ATV accident and had concluded that the accident could not have occurred in the way that Fitzpatrick claimed. At Fitzpatrick's re-trial, the Commonwealth intended to introduce video recordings of Corporal Thierwechter's accident reconstruction experiment. The events depicted in the recordings (as well as the actual experiment), the Commonwealth argued, were sufficiently similar to those on the day of the murder "to warrant admission…into evidence, and…any dissimilarities would go to the weight of the evidence and not its admissibility."[43]

---

[41]     *Id.* at 2 (quotation marks and citation omitted).

[42]     Commonwealth's Memorandum in Support of Its Positions During the Pre-Trial Conference, 5/6/2022, at 1. The Commonwealth also argued that the evidence against Fitzpatrick was sufficient to overcome a motion for a judgment of acquittal, *id.* at 1-7, that, in response to a motion filed by Fitzpatrick, he should be held without bail pending and during trial, *id.* at 7-8, and that, should Fitzpatrick open the door, Annemarie's note and email would be admissible as impeachment evidence, *id.* at 8-14. As these arguments are not part of the present appeal, we do not discuss them further.

[43]     *Id.* at 14. *See Commonwealth v. Spotz*, 756 A.2d 1139, 1155 (Pa. 2000) ("Experimental evidence . . . is admissible only if the conditions under which the experiment is conducted are substantially similar to those at the time of the event in question.").

The trial court conducted the pre-trial conference on the record. The Commonwealth discussed with the court the two new witnesses that it intended to call at Fitzpatrick's re-trial. The Commonwealth explained that it intended to call York County Coroner Pamela Gay to testify that she had certified the manner of Annemarie's death as a homicide on the death certificate in 2014, two years after Annemarie's death.[44] Although Gay did not view the body and did not conduct any tests on the body,[45] she based her conclusion upon "her review of the circumstances surrounding the death."[46] Next, in view of this Court's evidentiary ruling, the Commonwealth had attempted to "find somebody who is an expert in not only pathology but knows the field of aquatic deaths and specifically drowning deaths."[47] That search led to Dr. Caruso, who would render an opinion at Fitzpatrick's re-trial on the manner of Annemarie's death.[48]

In the meantime, Fitzpatrick filed a motion and brief requesting release on bail pending his re-trial. On May 24, 2022, the trial court held a hearing, at which, upon the agreement of both parties, the court took judicial notice of the evidence presented during Fitzpatrick's first trial. The only live witnesses were Fitzpatrick and his father. The latter testified that, if released on bail, Fitzpatrick could live with him. As evidence of the strength of its case, and presumably to demonstrate that it had remedied its earlier inability to prove the manner of Annemarie's death, the Commonwealth submitted an expert report from Dr. Caruso, who opined that the manner of Annemarie's death likely was homicide. The trial court took the matter under consideration and recessed the

---

[44] N.T., 5/6/2022, at 3-4.

[45] *Id.* at 5.

[46] *Id.* at 4.

[47] *Id.* at 6.

[48] *Id.*

hearing. On June 3, 2022, the trial court granted Fitzpatrick's motion, releasing him on supervised bail.

In an opinion accompanying its order, the trial court explained that Article I, Section 14 of the Pennsylvania Constitution precludes bail for an offender charged with a crime for which life in prison is a prescribed penalty where the "proof is evident or presumption great."[49] In *Commonwealth v. Talley*, this Court held that the standard "proof is evident or presumption great" requires that, to meet its burden, the Commonwealth must produce a "substantial quantity of legally competent evidence."[50] That evidence must be such that it is "substantially more likely than not that an accused is nonbailable."[51]

The trial court noted that this Court had found that the erroneous admission of Annemarie's note was not harmless, in significant part because Dr. Bollinger could not "offer a definitive opinion on the manner of death."[52] To correct this "possible shortcoming,"[53] the Commonwealth supplemented the record with Dr. Caruso's written report. The trial court noted Dr. Caruso's acknowledgement that:

> [t]his case is difficult for two reasons. First and foremost, there is only one witness to the events that resulted in Ann[e]marie Fitzpatrick's death and that individual is accused of being responsible for it. The other complication is that the clothing was never made available for examination, and the body was embalmed prior to the autopsy being performed, with a 2 ½ day

---

[49] Order Granting Supervised Bail, 6/6/2022, at 2-3; PA. CONST. art. 1, § 14; *see also Commonwealth v. Talley*, 265 A.3d 485, 523 (Pa. 2021).

[50] *Talley*, 265 A.3d at 524.

[51] *Id.* at 525.

[52] Order Granting Supervised Bail, 6/6/2022, at 6 (quoting *Fitzpatrick*, 255 A.3d at 463).

[53] *Id.*

postmortem interval. Dr. Bollinger had to perform an autopsy under suboptimal conditions.[54]

Dr. Caruso opined that "the likelihood of the events just preceding Ann[e]marie Fitzpatrick's death occurring as described by her husband, to a reasonable degree of medical certainty, is minimal at best."[55] The trial court rejected Dr. Caruso's position, as it appeared to suffer from the same shortcoming we had noted earlier: "[d]isproof of one theory is not the equivalent of proof of another."[56] Dr. Caruso also had placed significant weight upon Corporal Thierwechter's reenactment experiments, which Dr. Caruso described as "imperfectly designed."[57] The trial court pointed out that Dr. Caruso frequently used equivocal language in explaining his conclusions, words such as "more likely," "unlikely," "possibly," and "at least problematic."[58]

The trial court acknowledged that Dr. Caruso was "eminently qualified" to offer an opinion on the cause of death, but that, as to manner of death, he could only speculate.[59] Dr. Caruso stated that he held his opinions to a "reasonable degree of medical certainty."[60] However, the use of these "magic words" did not, the court stressed, necessarily mean that the opinion satisfied the applicable standard.[61] Because Dr. Caruso's opinion was based only upon disproof of an alternative theory, equivocal

---

[54] *Id.* (quoting Consultation Report on the Death of Ann[e]marie Fitzpatrick, 2/8/2022, at 2-3).

[55] Consultation Report on the Death of Ann[e]marie Fitzpatrick, 2/8/2022, at 3.

[56] Order Granting Supervised Bail, 6/6/2022, at 7 (quoting *Fitzpatrick*, 255 A.3d at 485).

[57] Consultation Report on the Death of Ann[e]marie Fitzpatrick, 2/8/2022, at 4.

[58] Order Granting Supervised Bail, 6/6/2022, at 7-8.

[59] *Id.* at 7.

[60] *Id.* at 8.

[61] *Id.*

conclusions, and "imperfectly designed" experiments, the trial court could not "conclude that the Commonwealth has met its burden, by a *substantial quantity of legally competent evidence*, that the *manner* of death was the result of an unlawful killing."[62]

On June 8, 2022, the Commonwealth filed an emergency petition in the Superior Court, seeking to stay the trial court's bail order. The intermediate court issued an order temporarily granting the request and directing Fitzpatrick to respond to the Commonwealth's petition. On January 5, 2023, the Superior Court granted the Commonwealth's petition, reversed the trial court, and remanded the case to the trial court with the directive to revoke, and then deny, bail. The court did not explain the ruling.

Meanwhile, on June 30, 2022, the Commonwealth had filed a motion *in limine* in the trial court. The Commonwealth sought a ruling on the admissibility of the recordings of the ATV accident reconstruction and Dr. Caruso's expert testimony.[63] On August 15, 2022, the parties appeared before the trial court for another pre-trial conference. The defense sought a continuance of the scheduled re-trial date in order to explore the possibility of securing its own expert to review, and possibly counter, the Commonwealth's new evidence. The trial court granted the request and postponed the re-trial.[64] While discussing potential new trial dates, the trial court reminded the parties that it had yet to rule on the Commonwealth's motion *in limine*.[65] The court expressed some concern over whether Dr. Caruso's opinion meets the "standard of within a reasonable degree of medical certainty," when the court and the parties were "operating

---

[62]     *Id.* at 9 (emphasis in original).

[63]     Fitzpatrick filed a brief in opposition to the Commonwealth's motion *in limine* on January 5, 2023.

[64]     N.T., 8/15/2022, at 7.

[65]     *Id.* at 4.

on the basis of a letter at this point."[66] The Commonwealth stated that it planned to call as a witness "Dr. Caruso in order to aid [the court] with making that determination on [its] pretrial motion" prior to trial.[67]

On January 10, 2023, Dr. Caruso testified at a pre-trial hearing. He explained that, as a forensic pathologist, he performs autopsies and, based upon his findings, offers opinions on both the cause and the manner of a deceased's death.[68] Dr. Caruso reviewed copious materials related to Annemarie's death. These included Annemarie's medical records, the autopsy report, trial transcripts, hundreds of photographs (including photographs of the autopsy, of Fitzpatrick, and of the scene of the death), reports relating to the reconstruction of the ATV accident, interviews with Fitzpatrick and emergency medical personnel, and the audio recording of the 911 phone call.[69] After reviewing these materials, Dr. Caruso concluded that the manner of death, in his opinion, was homicide.[70] Dr. Caruso confirmed that part of the process in deciding the manner of one's death was the exclusion of other possible explanations.[71] Because Annemarie's body bore significant physical injuries and Fitzpatrick had suffered nearly none, Dr. Caruso believed that the death could not have occurred in the accidental manner suggested by Fitzpatrick, a conclusion that contributed to Dr. Caruso's opinion that Annemarie's death was a

---

[66] *Id.* at 5.

[67] *Id.*

[68] N.T., 1/10/2023, at 14. Based upon his extensive qualifications, and having received no objection or opposition from the defense, the trial court certified Dr. Caruso as an expert in the field of forensic pathology. *Id.* at 21.

[69] *Id.* at 22-26.

[70] *Id.* at 64.

[71] *Id.* at 66.

homicide.[72] When asked on direct examination whether he held these opinions to a reasonable degree of medical certainty, Dr. Caruso said "yes."[73]

However, during cross-examination, Dr. Caruso was compelled to give ground. After extensively examining the factors that led to Dr. Caruso's opinion, including the injuries to Annemarie's body, the toxicology evidence, and the "imperfectly designed" recreation attempt, defense counsel asked Dr. Caruso whether it was "equally possible" that the manner of death was accidental. Dr. Caruso retreated from his earlier opinion, now stating that, "manner is actually *more likely than not, not to a reasonable degree of medical certainty*."[74] Defense counsel then asked Dr. Caruso to restate his level of certainty. Dr. Caruso repeated that "[it's] not held to a reasonable degree of medical certainty. It's more likely than not."[75] Dr. Caruso then stated that he "think[s] the manner of death is homicide."[76]

The trial court sought clarification concerning the level of certainty with which Dr. Caruso held this opinion. Once more, Dr. Caruso stated that the standard that he used was "more likely than not."[77] The following exchange then occurred:

> THE COURT: When you talk about the manner of death being a homicide, that opinion is held more likely than not, not to a reasonable degree of scientific certainty?

---

[72]     *Id.* at 73.

[73]     *Id.* at 75.

[74]     *Id.* at 171 (emphasis added).

[75]     *Id.*

[76]     *Id.* at 171-72.

[77]     *Id.* at 173.

[DR. CARUSO]:    Yes.[78]

The trial court concluded the hearing and took the matter under consideration. On January 20, 2023, the Commonwealth filed a "Post-Hearing Motion In Support of Its Motion *In Limine*," arguing that Dr. Caruso's testimony was admissible as competent expert testimony because, at all times, Dr. Caruso was unequivocal in his belief that the manner of Annemarie's death was homicide. The Commonwealth maintained that the use of conditional language did not render his opinion equivocal or inadmissible, when that opinion, read in its entirety, was definitive and certain. "The law does not require every utterance from a medical expert to be certain, positive, and without reservation or exception."[79] The Commonwealth insisted that Dr. Caruso never deviated from his opinion that Annemarie was unlawfully killed.

In a March 20, 2023 order, the trial court denied the Commonwealth's motion *in limine*.[80] The court held that Dr. Caruso could testify as to the cause of Annemarie's death, but not as to its manner. After summarizing the legal standards governing admission of expert testimony, which require that "the opinion of an expert witness must be rendered within a reasonable degree of medical certainty" and further require courts

---

[78]    *Id.* at 173-74; *see also id.* at 202 ("It's up to me as the expert to analyze and decide which ones I find valid. At the end of the day, I found that a homicide for manner to me in my opinion is *more likely than* an accident . . . .") (emphasis added).

[79]    Commonwealth's Post-Hearing Motion In Support of Its Motion *In Limine*, 1/20/2023, at 1 (unpaginated) (citation omitted).

[80]    In its order, the trial court disposed of other pending matters raised by the Commonwealth. For instance, the court granted the Commonwealth's motion to deny a challenge raised by Fitzpatrick to Dr. Caruso's methodology under *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), and it granted the Commonwealth's request to set a date certain for the re-trial to commence. Order Resolving Pre-Trial Motions and Scheduling Trial, 3/20/2023, at 1. The trial court denied the Commonwealth's "request to present evidence of the ATV experiments conducted by the State Police." *Id.* at 2. The Superior Court reversed that ruling on appeal. However, because Fitzpatrick did not seek allowance of appeal on that issue, no further discussion of it is required here.

to consider an expert's testimony in its entirety,[81] the trial court reviewed Dr. Caruso's testimony. The court found that testimony to be equivocal and uncertain. The court could not ignore the fact that Dr. Caruso often hedged his testimony with terms such as "unlikely," "possibility," "I don't think," "probably," and "consistent with."[82] The court found determinative Dr. Caruso's testimony that he did not hold the opinion that the manner of Annemarie's death was homicide to a reasonable degree of scientific certainty. Dr. Caruso opined only that homicide was "more likely than not."[83]

Drawing from *Commonwealth v. Smith*,[84] the trial court explained that manner of death, be it suicide, homicide, accident, etc., is something that ordinarily can be determined by the jury without the assistance of an expert.[85] Because Dr. Caruso's opinion on manner of death failed to meet the criteria for the admission of expert testimony, that was "clearly the case here."[86] The jury would have to decide manner of death on its own. "The Doctor's opinion on manner of death adds nothing to the jury's understanding of the main issue in controversy—whether this case is a homicide— beyond what the jurors can get from listening to the other evidence which [the court] expect[ed] to be presented in the case and drawing their own conclusions."[87]

---

[81] *Id.* at 11-12 (quoting *Carrozza v. Greenbaum*, 866 A.2d 369, 379 (Pa. Super. 2004); *Griffin v. Univ. of Pittsburgh Med. Ctr., Braddock Hosp.*, 950 A.2d 996, 1000 (Pa. Super. 2008)).

[82] *Id.* at 13.

[83] *Id.* (quoting N.T., 1/10/2023, at 171, 172, and 173-74).

[84] 808 A.2d 215 (Pa. Super. 2002).

[85] *Id.* at 229.

[86] Order Resolving Pre-Trial Motions and Scheduling Trial, 3/20/2023, at 14.

[87] *Id.*

The Commonwealth appealed. In a divided, published opinion, the Superior Court reversed.[88] The Superior Court commenced its examination of the admissibility of Dr. Caruso's testimony with the following statement from *Smith*:

> The cause of a death is usually established by the opinion testimony of medical experts, whereas a conclusion upon the question of whether a death from 'external causes of violence' was 'accidental, suicidal, or homicidal' may ordinarily be determined by a jury without the assistance of expert witnesses.[89]

The panel criticized the trial court for relying too heavily upon this one sentence from *Smith* and for concluding that Dr. Caruso's testimony "[was] prohibited because he is an expert, and manner of death determinations are for the jury to decide after listening to the evidence."[90] The trial court's holding, at least as it was framed by the Superior Court, misread *Smith*. The line quoted above from *Smith* used the word "may," not "shall," when describing the applicable standard for proving the manner of a person's death.[91] According to the panel, *Smith* stated only that a jury is *permitted* to decide the manner of death without the assistance of expert testimony, which does not mean that the Commonwealth is precluded from submitting expert testimony in order to assist the jury in that determination.

The panel deemed the trial court's holding erroneous because that holding purportedly "forc[ed] the jury to have to rely on circumstantial and demonstrative evidence

---

[88] *Commonwealth v. Fitzpatrick*, 316 A.3d 987, 990 (Pa. Super. 2024). The Superior Court also reversed the trial court's ruling regarding the admissibility of the evidence pertaining to the recreation of the ATV accident. As noted above, that issue no longer is part of this appeal.

[89] *Smith*, 808 A.2d at 229 (citation omitted).

[90] *Fitzpatrick*, 316 A.3d at 999.

[91] *Id.*

to determine manner of death for themselves." [92]  The panel perceived that its first task was to "determine if and when it is permissible for an expert to testify as to manner of death."[93]  The majority outlined the differences between cause and manner of death.  The former, the majority explained, must be "definite" because it "refers to the but-for cause of death such as the specific injury or disease."[94]  However, the latter—manner of death— need only be "probable" because it is an issue that can be decided by a jury alone.[95]  That being the case, the majority concluded, "[i]n many circumstances, the jury comes to its own conclusion on manner of death based on the evidence, but if a witness does testify as to manner of death, the statements need only be 'probable' because they are opinions, not facts."[96]

The majority turned to the applicability of *Griffin*, a case extensively relied upon by Fitzpatrick.[97]  In *Griffin*, an expert testified in a medical malpractice trial in which the primary factual issue was causation of the plaintiff's shoulder injury.[98]  The expert testified that there was a 51% chance that the plaintiff's injury was caused by the hospital and a 49% chance that it was caused by a seizure.[99]  On appeal, the Superior Court "had to determine if, in the context of a medical malpractice case, an expert needs to state the cause of injury to a reasonable degree of medical certainty, even though the burden of

---

[92]      *Id.*

[93]      *Id.*

[94]      *Id.* at 1000.

[95]      *Id.* (quoting *Smith*, 808 A.2d at 229).

[96]      *Id.* (footnote omitted).

[97]      The trial court also cited *Griffin*.  *See* Order Resolving Pre-Trial Motions and Scheduling Trial, 3/20/2023, at 12-13; *see also supra* note 81.

[98]      950 A.2d at 998.

[99]      *Id.* at 999.

proof on civil plaintiffs is generally by a preponderance of the evidence, or 51 percent."[100] Although the *Griffin* expert used the "magic words"[101]—reasonable degree of medical certainty—"it became apparent from the totality and the substance of his entire testimony that he only actually opined that [the hospital's actions were] more likely than seizure on a 51-49 basis, *i.e.*, a nearly equal basis."[102] The *Griffin* court held that this "degree of certainty is akin to an opinion stating that the alleged cause could very properly account for the injury or that it more likely than not caused the injury, both of which do not meet the requisite degree of medical certainty."[103] Thus, there was "insufficiently competent expert evidence on the critical element of causation,"[104] because the expert's ultimate opinion was not held "to the legally requisite degree of certainty."[105]

Here, the Superior Court found *Griffin* to be distinguishable. First, the panel highlighted, "[t]his is not a medical malpractice case, let alone a civil case."[106] Second, *Griffin* concerned only the cause of a shoulder injury, not a person's death. Finally, and "[m]ost importantly, the expert in *Griffin* testified to the cause of injury, not manner of injury."[107] Because "*manner* of injury, let alone *manner of death*, was absent from our discussion in *Griffin*,"[108] the panel here deemed that precedent inapplicable.

---

[100]    *Fitzpatrick*, 316 A.3d at 1000 (internal quotation marks omitted).

[101]    *Griffin*, 950 A.2d at 1001.

[102]    *Id.* at 1003.

[103]    *Id.* (internal quotation marks and citations omitted).

[104]    *Id.* at 1004.

[105]    *Id.* at 1003.

[106]    *Fitzpatrick*, 316 A.3d at 1001.

[107]    *Id.*

[108]    *Id.* (emphasis in original).

The majority found other decisions from this Court and from its own Court to be more relevant and applicable.  For instance, in *Commonwealth v. Jacobs,*[109] we held that a medical expert could testify to the manner of an infant's death because the expert had offered a medical opinion, not a legal conclusion.[110]  In *Commonwealth v. Woodward*,[111] we discerned nothing improper about a forensic pathologist offering a medical opinion regarding the manner of a toddler's death when the defendant had argued that the child had accidentally drowned.[112]  In *Commonwealth v. Yale*,[113] a defendant charged with murdering his wife called two experts to opine that the death had been accidental.[114]  The Commonwealth, which had called an expert during its case-in-chief, countered the two defense experts by calling another expert during rebuttal.  The defendant, who was convicted, argued on appeal that the Commonwealth should have been precluded from calling the second expert during the rebuttal stage, maintaining that such testimony only could be introduced during the Commonwealth's case-in-chief.  The Superior Court disagreed, finding nothing erroneous or inadmissible in the substance, scope, or timing of the testimonies of the Commonwealth's experts.[115]  The *Yale* court "noted nothing improper about the fact that the expert, after viewing the medical evidence and explaining the victim's injuries and their probable causes, testified as to both cause of death and

---

[109]    639 A.2d 786 (Pa. 1994).

[110]    *Id.* at 790.

[111]    129 A.3d 480 (Pa. 2015).

[112]    *Id.* at 488-89.  The appellant in *Woodward* did not challenge the admissibility or substance of the expert's opinion, and this Court did not directly address the issue.  The substance of the expert's opinion was mentioned only as part of this Court's recitation of the background of the case.

[113]    150 A.3d 979 (Pa. Super. 2016).

[114]    *Id.* at 981.

[115]    *Id.* at 982-83.

manner of death in his medical opinions, regardless of what point in the trial the testimony occurred."[116]

Synthesizing *Jacobs*, *Woodward*, and *Yale*, the panel below concluded that, although a jury is permitted to determine the manner of a person's death without the assistance of expert testimony, when the Commonwealth nonetheless elects to present such testimony to aid the jury, the expert opinions need only be "probable," not held to a reasonable degree of certainty, because "they are medical opinions, not legal conclusions or facts."[117]  The panel noted that it is the jury's role to assign the weight to be afforded a qualified expert's testimony, a function that it deemed particularly "germane" in manner of death expert testimony, "because expert testimony is opinion, and the jury need not take the expert's opinion on manner of death as fact."[118]  Furthermore, the court held, although generally an expert must "base the substance of his opinion on a reasonable degree of certainty instead of mere speculation," the expert does not have to express the opinion using those "magic legal words."[119]  Instead, the court held, an expert's opinion is admissible "as long as [that] opinion is sturdy."[120]

Applying these novel standards, the panel determined that the trial court had abused its discretion in finding that Dr. Caruso's testimony lacked the requisite sturdiness.[121]  Although Dr. Caruso used terms such as "possibility," "unlikely," "I don't think," and "consistent with," the panel explained, Dr. Caruso asserted that these terms

---

[116]   *Fitzpatrick*, 316 A.3d at 1003.

[117]   *Id.* at 1003-04.

[118]   *Id.* at 1004.

[119]   *Id.*

[120]   *Id.*

[121]   *Id.* at 1005.

often are used by medical examiners and coroners.[122] Dr. Caruso specifically testified that the phrase "more likely than not" is a common term used in his field.[123] The court held that Dr. Caruso's failure to use the "magic legal words" of "to a reasonable degree of medical certainty" at every turn in his testimony did not render his testimony speculative or incompetent. The opinion only had to be "probable," not "definitive."[124] Because the panel held that an opinion on the manner of death must only be probable, such an opinion never needs to be held to a reasonable degree of certainty.[125]

The majority opined that its holding was "compatible" with this Court's decision in *Commonwealth v. Spotz*.[126] In that case, a pathologist testified as an expert on both the cause and the manner of a murder victim's death, even though the pathologist was not the coroner who performed the autopsy. The pathologist explained that, generally, it was the coroner's "province" to make manner of death determinations and admitted that he did not hold his opinion to a reasonable degree of certainty. After being convicted of murder and sentenced to death, the defendant appealed, arguing, *inter alia*, that the pathologist was unqualified to be an expert and did not state his opinion to a reasonable degree of certainty.[127]

We held that the pathologist was qualified to testify as to the manner of death, even though, generally, those determinations fall within the coroner's "province." That did not mean that no other professional can be qualified to make that determination. We

---

[122]     *Id.*

[123]     *Id.* at 1005-06.

[124]     *Id.* at 1006.

[125]     *Id.*

[126]     756 A.2d at 1160.

[127]     *Id.*

noted that the pathologist in the case also performed autopsies and had on many occasions rendered manner of death determinations. Thus, we held, the pathologist was qualified to offer expert testimony.[128]

We then reiterated that an expert does not need to use any particular "magic words"[129] when offering opinion testimony. Rather, courts are required to consider the entirety and the substance of an expert's testimony in order to ensure that the proffered opinion was not based upon speculation alone. Regardless of how the opinion is stated, it is the court's job to ensure that the expert's opinion is based upon a reasonable degree of certainty.[130] The panel below asserted that this was precisely what it had done when it held Dr. Caruso's testimony to be admissible. Like the expert in *Spotz*, Dr. Caruso is a pathologist and, as such, is permitted to offer his opinion at Fitzpatrick's re-trial. Any equivocation or uncertainty in his opinion goes to the weight to be assigned to that opinion, but not to its admissibility.[131]

Judge Lazarus disagreed, criticizing the panel's majority for adopting and applying an "inappropriately lenient standard" for the admission of expert testimony regarding the manner of one's death.[132] Although she agreed that an expert witness need not use any

---

[128]    *Id.*

[129]    *Id.*

[130]    *Id.*

[131]    *Fitzpatrick*, 316 A.3d at 1006.

[132]    Judge Lazarus concurred in part and dissented in part. *Id.* at 1007 (Lazarus, J., concurring and dissenting). Judge Lazarus agreed with the Superior Court majority that the trial court had erred in finding the demonstrative ATV accident reconstruction evidence to be inadmissible. Thus, she joined that portion of the Superior Court's majority opinion. *Id.* As noted, that issue is not relevant in this appeal. *See supra* note 88.

specific "magic words," any expert opinion still must be held to a reasonable degree of certainty in order to be admissible.[133]

Noting that this principle is "routinely" applied to all expert opinions,[134] Judge Lazarus objected that the panel unjustifiably exempted manner of death opinions from this "long-recognized standard."[135] This error, she observed, placed the Superior Court here in direct conflict with this Court's holding in *Spotz*, in which we held that "manner of death must be held to our Commonwealth's requisite degree of medical certainty."[136]

In order to sidestep this principle, Judge Lazarus asserted, the panel "embark[ed] upon a lengthy *dicta*-led journey" that ended by "mischaracterizing the holding in *Spotz*."[137] In order to exempt manner of death opinion testimony from governing standards, the panel majority "blatantly mischaracterize[d]" the law in a way that allows manner of death opinions to be stated only in terms of probability, as opposed to reasonable medical certainty.[138] This allowed the panel to mold Dr. Caruso's speculative opinion into something compatible with *Spotz*. In reality, the panel majority's novel holding was "in direct conflict" with *Spotz*,[139] where this Court applied the "same standard" to expert opinions on both manner of death and cause of death.[140] Judge Lazarus pointed

---

[133] *Fitzpatrick*, 316 A.3d at 1007 (Lazarus, J., concurring and dissenting).

[134] *Id.* (citing *Commonwealth v. Gonzalez*, 109 A.3d 711, 727 (Pa. Super. 2015); *Gillingham v. Consol Energy, Inc.*, 51 A.3d 841, 849 (Pa. Super. 2012); *Commonwealth v. Radford*, 236 A.2d 802 (Pa. 1968)).

[135] *Id.*

[136] *Id.* (citing *Spotz*, 756 A.2d at 1160).

[137] *Id.*

[138] *Id.*

[139] *Id.*

[140] *Id.* at 1007-08.

out that *Spotz* expressly stated that expert opinions on manner of death must be based upon a "reasonable degree of medical certainty, rather than mere speculation."[141]

Judge Lazarus found "unpersuasive" the majority's attempt to distinguish manner of death opinion testimony from all other types of expert testimony.[142] She noted that Pa.R.E. 702 "makes no distinction among types of experts or types of expert opinion testimony."[143] To the contrary, the principle that all expert opinion testimony, without exception, must be offered to a reasonable degree of certainty "has been the law of this Commonwealth for decades."[144]

<u>Analysis</u>

We granted allowance of appeal in order to address the following two issues:

> Did the Superior Court err, and contravene this Court's and its own controlling precedent, when it ruled that an expert witness hired years after a death could opine that the manner of death was homicide and not have to hold that opinion to a reasonable degree of certainty, a standard [Dr. Caruso] himself admitted was not met, saying "It is not held to a reasonable degree of scientific certainty. It is more likely than not. Given the information I have on this case, I think the manner of death was homicide."?
>
> Did the Superior Court err when it used a standard of "probable" for determining manner of death when that standard was legislatively set for coroners' reports and not for use at trial, a point omitted by the Superior Court majority?[145]

This case presents a relatively straightforward question of law. In order to be admissible, must all expert opinions be held to a reasonable degree of certainty, or are

---

[141]  *Id.* at 1008 (quoting *Spotz*, 756 A.2d at 1160).

[142]  *Id.*

[143]  *Id.*

[144]  *Id.*

[145]  *Commonwealth v. Fitzpatrick*, 330 A.3d 394 (Pa. 2024) (*per curiam*). Because the two issues upon which we granted *allocatur* are interrelated, we address them as one.

expert opinions as to manner of death held to a lower standard?  Fitzpatrick maintains that Pennsylvania law has been clear and consistent and that, regardless of the discipline involved, all expert opinions must be held to a reasonable degree of certainty.[146]  The Commonwealth, on the other hand, argues that manner of death and cause of death have always been treated differently, as the former is not a legal conclusion, but rather a medical opinion that may be rendered using a probability standard.  For this reason, the Commonwealth contends, testimony as to manner of death need not be stated to a reasonable degree of certainty in order to be admissible.[147]  We agree with Fitzpatrick.

Expert witnesses "enjoy a privileged place in U.S. courtrooms,"[148] much more so than lay witnesses.  Lay witnesses typically are limited to testifying about facts or events that they personally observed; such witnesses generally are prohibited from offering opinion testimony.[149]  The expert, on the other hand, is called as a witness specifically to offer his or her opinion.[150]  Unlike the lay witness, the expert's testimony is not limited to what he or she personally observed.[151]  Moreover, the expert witness is permitted to offer an opinion that "embraces an ultimate issue" in a case, whereas the lay witness may not do so.[152]

---

[146]    Fitzpatrick's Br. at 14.

[147]    Commonwealth's Br. at 30.

[148]    Findlay & Strang, *supra* note 4, at 304.

[149]    *See id.*

[150]    Pa.R.E. 702 ("A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion . . .").

[151]    Pa.R.E. 703 ("An expert may base an opinion on facts or data in the case that the expert *has been made aware of* or personally observed.") (emphasis added).

[152]    Pa.R.E. 704.

That experts can testify to matters beyond the scope permitted to lay witnesses does not mean that expert testimony knows no bounds. A party seeking to present expert testimony must demonstrate that the testimony falls within the strictures of Rule 702 of the Pennsylvania Rules of Evidence, which provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson;
>
> (b) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and
>
> (c) the expert's methodology is generally accepted in the relevant field.[153]

The rule does not speak to how certain an expert must be in his or her opinion in order for that opinion to be admissible. This gap is backfilled by the rule's comment, which states that "Pa.R.E. 702 does not change the requirement that an expert's opinion must be expressed with reasonable certainty."[154] The comment correctly acknowledges that the reasonable degree of certainty standard is an evidentiary prerequisite to the admission of expert opinion testimony. This principle has been embedded—without exception—in our law for decades.

The term "reasonable degree of certainty" did not originate in Pennsylvania. It is believed to have taken root in Chicago, Illinois, around the turn of the 20th century.[155] The

---

[153]    Pa.R.E. 702.

[154]    Pa.R.E. Cmt. (citing *McMahon v. Young*, 276 A.2d 534 (Pa. 1971)).

[155]    *See* Jeff L. Lewin, *The Genesis and Evolution of Legal Uncertainty About "Reasonable Medical Certainty*," 57 MD. L. REV. 380, 407 (1998). Lawyers there coined the term in order to soften perceived tension between two evidentiary rules governing (continued…)

term first appeared in a published legal opinion in 1916, in *Fellows-Kimbrough v. Chicago City Railway Co.*,[156] a personal injury case.[157]  The phrase dropped out of reported opinions until 1931, when it began to appear frequently in workers' compensation cases.[158]  From there, the use of "reasonable degree of medical certainty" increased and, in short order, became part of the "normal lexicon" used by the Illinois bench and bar in nearly every area of law.[159]  However, the fact that lawyers were using the phrase did not mean that it carried any legal weight.  It was not until 1937, in *Shell Petroleum Corporation v. Industrial Commission*,[160] that the phrase was elevated from local parlance to legal significance.  There, the Supreme Court of Illinois vacated an award of damages, finding that the award was not supported by sufficient evidence because an expert witness, a physician, had failed to testify to "any reasonable medical certainty of a causal relationship between the blow on the head and the employee's total break down."[161]

In the decades that followed *Shell Petroleum*, the phrase spread across the country, eventually appearing for the first time in a published opinion in Pennsylvania in

---

expert testimony.  *Id.*  The Illinois Supreme Court had enacted the "reasonable-certainty rule," which prohibited experts from opining on the amount of potential damages in a civil lawsuit, and the "ultimate-issue rule," which banned experts from taking definitive positions on disputed issues that traditionally had to be resolved by juries.  *Id.*

[156]    111 N.E. 499, 502 (Ill. 1916).

[157]    *See* Lucy Johnson-Walsh, *et al.*, *The Unreasonably Uncertain Risks of "Reasonable Medical Certainty" in Child Abuse Cases: Mechanisms for Risk Reduction*, 66 DRAKE L. REV. 253, 257 (2018).

[158]    *See id.*

[159]    *Id.* at 258.

[160]    10 N.E.2d 352 (Ill. 1937).

[161]    *Id.* at 354.

1968.[162] Then, but for a smattering of decisions,[163] the phrase effectively disappeared from Pennsylvania case law. Its absence is most noticeable from this Court's opinion in *McMahon v. Young*.[164] In that case, a medical expert, while opining on causation in a personal injury case, testified that: (1) "the automobile accident is consistent with that sort of injury"; (2) "there is probably a cause and effect relationship"; and (3) "my opinion is there is an arthritis which is consistent with traumatic arthritis."[165] This Court noted that an expert opinion is substantive evidence that, if believed, can suffice to prove an element of a cause of action. But, in order to do so, the opinion must be direct and "made with sufficient certainty."[166] Because the expert's testimony lacked that certainty, and instead was expressed in terms of probability, it was "not enough" to constitute competent evidence.[167] However, despite the local and national emergence of the reasonably certain standard, the *McMahon* Court did not use that phrase.

Finally, in the early-to-mid-1970s, the standard saw a "virtual explosion in usage" in Pennsylvania, including in decisions of this Court.[168] For instance, in *Commonwealth v. Webb*,[169] two brothers were convicted of murder after they assaulted another man in a

---

[162] *See DeVirgiliis v. Gordon*, 243 A.2d 459, 460 (Pa. Super. 1968) (Hannum, J., dissenting).

[163] Lewin, *supra* note 155, at 451 n.342 ("The phrase appeared in only one other state court opinion from the 1960s and in only sixteen more cases prior to 1975.").

[164] 276 A.2d 534 (Pa. 1971).

[165] *Id.* at 535 (parenthetical marks removed).

[166] *Id.*

[167] *Id.*

[168] Lewin, *supra* note 155, at 451 n.342.

[169] 296 A.2d 734 (Pa. 1972).

social club.[170]  At their trial, a pathologist testified that the injuries inflicted during the assault caused the victim's death.  On appeal, the bothers argued to this Court that the evidence had been insufficient to prove that their actions had caused the victim's death, because the pathologist did not state his conclusion beyond a reasonable doubt.[171] Noting that beyond a reasonable doubt is a legal standard, not an evidentiary one, this Court rejected the brothers' argument.  We held that the pathologist's opinion, which was stated "with a reasonable degree of medical certainty," was sufficient to prove causation.[172]  Two years later, in *Commonwealth v. Stoltzfus*,[173] this Court, drawing largely from *Webb*, once more held that, in order for expert medical testimony to be admissible, the expert must "entertain a reasonable degree of medical certainty for his conclusions."[174]

This Court's insistence that expert testimony be held to a reasonable degree of certainty did not end with that initial "explosion."  We routinely have applied this standard ever since.  In *Commonwealth v. Edmiston*, we opined that "[a] medical opinion is sufficient to support a finding when given with a reasonable degree of medical certainty."[175]  In *Spotz*, a forensic pathologist at a capital murder case testified that the "cause of death" was his "province, what did the person die of," and that the "manner of death" was the "province of the coroner."[176]  The pathologist explained that the coroner,

---

170    *Id.* at 735.

171    *Id*. at 737.

172    *Id.*

173    337 A.2d 873 (Pa. 1975).

174    *Id*. at 879 (citation omitted).

175    634 A.2d 1078, 1084 (Pa. 1993).

176    756 A.2d at 1160.

not the pathologist, "puts all the facts together, including the autopsies, and consequently certifies the manner of death."[177]   Despite this purported separation of duties, the pathologist nonetheless opined on the manner of death.   On appeal, the convicted defendant argued that the pathologist was not qualified to speak to manner of death.  This Court rejected the argument, finding that the pathologist was more than qualified because he had performed autopsies and had testified to manner of death hundreds of times. Simply because the pathologist believed that manner of death determinations were not the "province" of a pathologist does not, *ipso facto*, mean that a pathologist is unqualified to opine on the subject.[178]  The defendant also had argued that the pathologist's opinion was not admissible because it was not stated to a reasonable degree of certainty.  This Court found the argument unpersuasive because we have never required that an expert use any "magic words."[179]  A court must review the substance of the testimony, which, however stated, must demonstrate that the opinion was "based on a reasonable degree of medical certainty rather than upon mere speculation."[180]   Most recently, in *Commonwealth v. Walters*, albeit in the context of expert opinion testimony regarding the cause, not manner, of death, we reiterated that medical opinions must be "entertained [to] a reasonable degree of medical certainty."[181]  Adhering to this long, unbroken line of

---

[177]     *Id.*

[178]     *Id.*

[179]     *Id.*

[180]     *Id.*

[181]     323 A.3d 151, 157 (Pa. 2024) (quoting *Commonwealth v. Williams*, 316 A.2d 888, 891 (Pa. 1974)).

precedents, the Superior Court also consistently has required expert testimony to be held to this standard.[182]

This level of certainty is not limited to medical opinions. It applies to expert opinions of every variety. For instance, in *Povacz v. Pennsylvania Public Utility Commission*, we held that expert opinions as to whether smart meters emit radio frequencies in public utility cases must be "rendered to a reasonable degree of scientific certainty."[183] In *Barbour v. Commonwealth, Department of Transportation, Bureau of Driver Licensing*, we held that an expert opining on whether a driver was capable of making a knowing refusal to submit to chemical testing for consumption of alcohol was required to hold that opinion to a reasonable degree of certainty.[184] In *Detterline v. D'Ambrosio's Dodge, Inc.*, the Superior Court deemed admissible the opinion of an expert accident reconstructionist that was held to a reasonable degree of certainty.[185] And, in *Peerless Dyeing Co., Inc. v. Industrial Risk Insurers*, the Superior Court rejected an expert's opinion that damaged boilers caused injury to a plaintiff where that opinion was not held to the requisite standard, which left the jury to speculate about what caused the injuries.[186] In short, since the reasonable degree of certainty standard first was introduced

---

[182] *See, e.g., Griffin*, 950 A.2d at 1000; *Vicari v. Spiegel*, 936 A.2d 503, 510-11 (Pa. Super. 2007); *Carrozza v. Greenbaum,* 866 A.2d 369, 379 (Pa. Super. 2004); *Commonwealth v. Passmore*, 857 A.2d 697, 713 (Pa. Super. 2004); *Corrado v. Thomas Jefferson Univ. Hosp.*, 790 A.2d 1022, 1031 (Pa. Super. 2001); *Eaddy v. Hamaty*, 694 A.2d 639, 642 (Pa. Super. 1997).

[183] 280 A.3d 975, 1006 (Pa. 2002).

[184] 732 A.2d 1157, 1160 (Pa. 1999).

[185] 763 A.2d 935, 940 (Pa. Super. 2000).

[186] 573 A.2d 541, 547-48 (Pa. Super. 1990). The Superior Court broadly, but correctly, stated that "[i]t is settled that, to be competent, expert testimony must be stated with reasonable certainty." *Id.* at 547.

in Pennsylvania, our courts have applied it uniformly and to every expert discipline. Our research has uncovered no exceptions.

The foremost secondary sources summarizing Pennsylvania law are in accord. Professors Packel and Poulin, authors of the expert testimony sections of West's Pennsylvania Practice manual, describe the standard as a "certainty requirement," which "has evolved into a formula in which counsel and the courts ask an expert to express his or her opinion 'with reasonable medical certainty,' or with 'reasonable certainty' in some other field of expertise."[187] Professor Ohlbaum, author of the definitive treatise on Pennsylvania evidence, unequivocally states that "[a]n expert must hold an opinion to a reasonable degree of professional certainty."[188] Similarly, Pennsylvania's Civil Suggested Standard Jury Instruction advises jurors in a civil trial that "[a]n expert witness gives [his or her] opinion, to a reasonable degree of professional certainty, based upon the assumption of certain facts."[189]

The above survey of Pennsylvania authorities demonstrates that Pennsylvania law is unmistakably clear. Our case law, evidentiary rules, and supporting secondary materials require that an expert hold his or her opinion to a reasonable degree of certainty in order to be admissible in legal proceedings. Those same authorities recognize no exception to the rule. Thus, when the Superior Court below crafted an exception for expert opinions touching upon the manner of an alleged murder victim's death, that court

---

[187] Leonard Packel & Anne Bowen Poulin, *Certainty of expert testimony*, 1 West's Pa. Prac., Evidence § 702-6 (4th ed. 2025) (citations omitted).

[188] Edward D. Ohlbaum, *Ohlbaum on the Pennsylvania Rules of Evidence*, § 702.07 (2025).

[189] Pa. SSJI (Civ) § 4.80 (2024). The criminal jury instruction manual does not use the same phrase, but nothing in our cases suggests that expert testimony is understood differently in criminal and civil courts.

had to circumvent the heavy, binding weight of the history and consistency of these authorities. The court's attempt to do so was erroneous.

To start, the panel's majority mischaracterized the trial court's ruling. The trial court cited *Smith* for the proposition that proof of the manner of one's death does not require expert testimony. The trial court correctly recognized that a jury may resolve the issue solely by relying upon the circumstantial evidence presented at trial. The Superior Court's majority, however, read the trial court's recitation of these basic premises as *prohibiting* expert testimony on the manner of death in a murder case.[190] The trial court did no such thing. The trial court instead correctly recognized that, when a party elects to present expert opinion testimony on the manner of death, that testimony must comport with the rules governing the introduction of all expert testimony. At no point did the trial court state that expert testimony is entirely prohibited on this topic. The court held only that, in this case, Dr. Caruso's testimony did not meet the standards for admissibility of expert testimony.

Having misread the trial court's ruling, the panel's majority felt bound to decide anew whether a party is permitted to present expert testimony as to the manner of death. The court correctly concluded that a party, in fact, could do so. However, the court immediately committed another error. The court held that such an expert was not obliged to hold his or her opinion on the issue to a reasonable degree of medical or scientific certainty. Instead, the panel found, an expert's opinion on this topic need only be "probable."[191] This, according to the panel, was because manner of death is an issue that a jury often determines on its own. Apparently, the panel believed that, because the opinion evidence was not required, that opinion did not have to comply with the law

---

[190] *Fitzpatrick*, 316 A.3d at 999.

[191] *Id.* at 1000.

governing such testimony. The court cited no authority in support of this novel, and patently erroneous, proposition, nor are we aware of any. To the contrary, as we made clear above, all "expert[s] must hold an opinion to a reasonable degree of professional certainty."[192]

The court then compounded its error. The panel posited that manner of death opinions need only be "probable" because "they are *opinions*, not facts."[193] The court did not offer any explanation of why this type of opinion is exempt from the rules governing opinions. Nor did the court explain its apparent belief that these rules would apply differently if the expert testified to "facts."[194] We do not follow the logic of the panel's analysis. We only state once more that all expert opinion testimony must comply with the same governing rules. Those rules do not allow for more-likely-than-not opinions.

The Superior Court's majority then attempted—unsuccessfully—to reconcile its holding with Pennsylvania's unambiguous case law. First, the court took aim at its own decision in *Griffin*. In that case, an expert offered an opinion that differed in no substantive way from Dr. Caruso's testimony in the case *sub judice*. The expert in *Griffin* opined that it was 51% likely that medical personnel caused the injury to the plaintiff and that it was 49% likely that the injury resulted from a seizure. The *Griffin* court held that this more-likely-than-not opinion was inadmissible, because it did not meet the "requisite degree of medical certainty" standard.[195] *Griffin* is on all fours with the present matter. Dr. Caruso also testified that he believed that it was more-likely-than-not that Annemarie's death was a homicide, not an accident. That opinion, too, is inadmissible under *Griffin*. However,

---

[192]    Ohlbaum*, supra* note 188.

[193]    *Fitzpatrick*, 316 A.3d at 1000 (emphasis added).

[194]    *Id.*

[195]    *Griffin*, 950 A.2d at 1003.

the panel below concluded otherwise. The panel attempted to distinguish *Griffin* on two fronts. First, the panel surmised that *Griffin* was inapplicable because it was a civil malpractice case, not a criminal case. We fail to see how that matters. The Superior Court below made no attempt to explain why it does. The Pennsylvania Rules of Evidence apply equally to civil and criminal cases. Rule 702 is not limited to any category of cases. So long as a party in a legal proceeding is offering expert testimony, Rule 702 governs. Thus, an appellate court decision enforcing that rule is not distinguishable merely because the subject matter of the underlying legal dispute is different. *Griffin* stands for the principle that expert opinions must be held to a reasonable degree of certainty, not to a bare probability. That principle certainly applies in criminal cases.

The panel then sought to distinguish *Griffin* because the expert testimony being challenged pertained to the cause of a plaintiff's injury, not to the manner of one's death.[196] The distinction also is of no relevance. The *Griffin* court's ruling was not predicated upon the particular topic of the expert's opinion. Rather, the import of *Griffin* is that expert opinions must be held to the reasonable certainty standard. Probability of belief is insufficient for admissibility under Rule 702. This rule is universally applicable, regardless of the topic of the proffered expert opinion. That the *Griffin* court did not mention manner of death does not mean that its rule can be summarily disregarded. To the contrary, *Griffin* correctly identified the rule. That rule applies to all expert opinions.

The court below correctly noted that an expert's opinion is not admissible simply because it is accompanied by certain "magic words."[197] An opinion will be admissible so long as the substance of the testimony, when read it its entirely, comports with the governing law. Instead of acknowledging that the law requires an opinion to be held to a

---

[196]    *Fitzpatrick*, 316 A.3d at 1001.

[197]    *Id.* at 1004.

reasonable degree of certainty, the panel held that an opinion must only be "sturdy."[198] The panel did not identify any parameters for this newly-concocted sturdiness measure. The panel did not define the term "sturdy," let alone provide guidance to courts as to how to apply this novel tool. It is unknown in our jurisprudence.

The panel did stress that expert testimony must be based in fact, not in possibilities, cannot amount to conjecture or surmise, and need not amount to an expression of absolute certainty.[199] However, those concerns are not new. They adequately are addressed by the reasonable certainty standard. These well-known limitations on expert testimony provide no cause to manufacture a new standard, certainly not one that applies to only one type of expert testimony, and surely not one that requires a court to determine whether testimony is "sturdy," a term that is incapable of being reliably and consistently applied.

Applying its newly-minted standard for admissibility, the Superior Court found that Dr. Caruso's testimony was sufficiently "sturdy" to warrant admission at Fitzpatrick's re-trial. Even though Dr. Caruso equivocated frequently and stated unambiguously that his opinion was not held to a reasonable degree of certainty, the panel nonetheless found that opinion to be admissible because, in its view, Dr. Caruso only had to believe it "probable" that Annemarie's death was a homicide.[200] This conclusion, the panel stated, was consistent with this Court's holding in *Spotz*, because Dr. Caruso, like the pathologist in *Spotz*, explained his medical background and the medical basis for his opinion. In the panel's view, because Dr. Caruso reached his opinion using the same level of certainty

---

[198]     *Id.*

[199]     *Id.* (quoting *Commonwealth v. Ward*, 188 A.3d 1301, 1311 (Pa. Super. 2018)).

[200]     *Id.* at 1006.

that coroners apparently use, the testimony was admissible, regardless of how Dr. Caruso articulated that standard in his testimony.

The Superior Court's ruling is in no way consistent with *Spotz.* There, we held that a qualified forensic pathologist could testify to the manner of a murder victim's death, even though, according to that pathologist, that typically was a decision made by a coroner. Regardless of the expert's occupation, or the traditional roles assigned to that occupation, our concern was with the substance of the expert's opinion and our job was to ensure that the opinion was "based on a reasonable degree of medical certainty rather than upon mere speculation."[201] Contrary to the Superior Court's attempts to align its ruling with *Spotz*, we did not hold that the pathologist's testimony was admissible simply because he formulated his opinion in the same manner that other pathologists or coroners do. We instead found the pathologist's opinion admissible because the pathologist held the opinion to a reasonable degree of certainty. The Superior Court's diminution of the reasonable certainty standard cannot be squared with our application of the full measure of that standard in *Spotz*.

All that remains is an analysis of whether Dr. Caruso's manner of death opinion was admissible. When viewed using the correct legal standard, it is clear that it was not. Although Dr. Caruso initially testified that he held his opinion to a reasonable degree of certainty,[202] our analysis cannot rest upon his singular utterance of those "magic words."[203] The remainder of Dr. Caruso's testimony demonstrates that those "magic words" were not an accurate description of Dr. Caruso's level of certainty with regard to his opinion on the manner of Annemarie's death.

---

[201] *Spotz*, 756 A.2d at 1160.

[202] N.T., 1/10/2023, at 75.

[203] *See Spotz*, 756 A.2d at 1160.

Dr. Caruso's testimony was at times equivocal and speculative. Dr. Caruso frequently conditioned his observations and opinions with phrases such as "unlikely," "possibility," and "probably." Such terms, by themselves, do not necessarily render an expert's testimony so speculative as to be inadmissible. However, the conditional nature of such terms cannot be ignored, particularly when Dr. Caruso made clear that his opinion was not held to the applicable legal standard. On cross-examination, Dr. Caruso unambiguously testified that, "manner is actually *more likely than not, not to a reasonable degree of medical certainty.*"[204] When asked a second time, Dr. Caruso once more stated that "[it's] not held to a reasonable degree of medical certainty. It's more likely than not."[205] Offered one last chance to clarify his opinion, Dr. Caruso stated that he "thinks" that the manner of death was homicide.[206]

Given the fact that Dr. Caruso first claimed that his opinion was held to a reasonable degree of certainty and then asserted that it was not, the trial court naturally sought clarification. The trial court asked Dr. Caruso if his opinion on manner of death was "held more likely than not, not to a reasonable degree of scientific certainty?"[207] Dr. Caruso answered "Yes."[208] Because more likely than not falls below the level of certainty required for the admission of expert testimony, the trial court correctly held that Dr. Caruso's testimony pertaining to the manner of Annemarie's death was inadmissible.

Disposition

---

[204] N.T., 1/10/2023, at 171 (emphasis added).

[205] *Id.*

[206] *Id.* at 171-72.

[207] *Id.* at 173.

[208] *Id.* at 174.

We reverse the Superior Court's order to the contrary and we remand this case for further proceedings consistent with this opinion.

Chief Justice Todd and Justices Donohue, Dougherty, Mundy, Brobson and McCaffery join the opinion.